SCHWEITZER *v.* PLYMOUTH CITY CLERK.

OPINION OF THE COURT.

1. OFFICERS — ELECTIONS — QUALIFICATIONS FOR PUBLIC OFFICE — POLICE POWER.

A qualification requirement for the holding of public office is not a regulation under the police power · of the sovereign, but rather is essentially a political decision.

2. SAME—QUALIFICATIONS FOR PUBLIC OFFICE.

Courts should not apply, in deciding the constitutionality of qualifications for holding of public office, the same standards of reasonableness and relationship to purpose as are found in cases dealing with regulations under the police power since such a qualification is not such a law as interferes with personal liberty or deprives one of the use and enjoyment of property.

3. SAME—QUALIFICATIONS FOR PUBLIC OFFICE.

Property ownership qualification for public office embodied in home-rule city charter approved by majority of people of the city should not be declared invalid solely on the grounds that such a requirement is irrational (City of Plymouth Charter, § 4.4).

4. SAME—QUALIFICATIONS FOR PUBLIC OFFICE—EQUAL PROTECTION.

A provision in a city charter that one may not hold municipal office unless he has for 2 years been the owner of property located within and assessed for taxes by the city does not violate the rights of nonproperty owners to equal protection of the laws (City of Plymouth Charter, § 4.4).

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 42 Am Jur, Public Officers §§ 37, 38.
[3, 4, 6, 7, 10] 42 Am Jur, Public Officers § 49.
[5, 11] 5 Am Jur 2d, Appeal and Error § 1009.
[8, 9] 16 Am Jur 2d, Constitutional Law §§ 50, 56.

5. Costs—Validity of Charter—Qualification for City Commissioner.

    No costs are allowed on appeal in action to compel city clerk to accept nominating petitions for office of city commissioner in which the validity of a charter requirement as to property ownership is concerned (City of Plymouth Charter, § 4.4).

Dissenting Opinion.

T. M. Kavanagh and Adams, JJ.

6. Officers — Municipal Corporations — Eligibility — City Charter—Equal Protection.

    *The government of a city is responsible for the welfare of all its citizens in numerous areas of local governmental activity and not merely for the protection and preservation of property; therefore, it cannot be said that a provision in a city charter requiring that a person have owned property taxed by the city for 2 years before he can be elected to the city commission bears some reasonable relationship to the city's governmental objectives (City of Plymouth Charter, § 4.4).*

7. Elections—Constitution—Right of Public to Select Leaders of its Choice.

    *The right of qualified electors to select officeholders by vote for governing body of a city is improperly infringed if candidacy is restricted by the imposition of a 2-year taxpaying property ownership qualification on candidates.*

8. Constitutional Law—Statutes.

    *Constitutional rights are not subject to legislative interference.*

9. Same—Sovereignty.

    *The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed.*

10. Officers—Municipal Corporations—Eligibility—Equal Protection.

    *Provision in a city charter which requires a person to own property assessed for taxes by the city for 2 years before he can be elected to the city commission bears no reasonable relationship to the achievement of proper governmental objectives and unduly limits a person's right to become a candidate and unduly limits the right of the citizens to associate for the advancement of political beliefs and to vote for the candidate of their choice; thus, it violates the equal protection clauses of the United States and Michigan Constitutions (US Const, Ams 1, 14; Mich Const 1963, art 1, § 2).*

11. Costs—Public Question—Eligibility for City Commissioner. *Contest of a city charter provision requiring candidates for city commissioner to have for at least 2 years owned property assessed for taxes by the city deals with a public question and therefore no costs are awarded on appeal (City of Plymouth Charter, § 4.4).*

Appeal from Wayne, Baum (Victor J.), J. Submitted June 12, 1968. (Calendar No. 4, Docket No. 51,753.) Decided February 3, 1969. Application for certiorari filed in Supreme Court of the United States May 2, 1969.

Complaint by Peter D. Schweitzer and others against the Clerk of the City of Plymouth and the Election Commission of the City of Plymouth for a writ of mandamus directing the defendant Clerk and Election Commission to accept plaintiff's nominating petitions and print the plaintiff's name on the primary election ballot. Writ granted. Defendants appeal. Leave to appeal to Supreme Court prior to decision by Court of Appeals granted. Reversed.

*Abdeen M. Jabara,* for plaintiffs and cooperating attorney for American Civil Liberties Union of Michigan.

*Draugelis & Ashton,* for defendants.

T. E. Brennan, C. J.

### 1. The Facts.

Peter Schweitzer lives in the city of Plymouth. Sometime before January 3, 1967, he decided to become a candidate for the office of city commissioner. He submitted to the city clerk petitions signed by 40 electors, requesting that plaintiff Schweitzer's name be printed on the ballot in the 1967 spring election.

The defendant clerk refused to accept the petitions. He wrote plaintiff Schweitzer as follows:

"Since you do not meet all of the eligibility and qualification requirements as enumerated in section 4.4 of the city charter, your nominating petition for the office of city commissioner is hereby rejected and your name will not be placed on the ballot for election of city commissioners to be conducted in the spring of 1967.

"Specifically, this decision is based upon the fact that you do not meet the following eligibility requirement;

"'To be eligible to hold an elective office, a person shall also have been, for a period of two years, prior to the date of his election or appointment to office, the owner of property located within and assessed for taxes by the city.'"

Thus frustrated in his efforts to run for city commissioner, plaintiff Schweitzer filed suit in Wayne county circuit court.

On March 13, 1967, the learned circuit judge issued his judgment of mandamus, directing the defendant clerk to accept the petitions and print Schweitzer's name on the ballot.

We granted leave to appeal, bypassing the Court of Appeals.

## 2. The Issues.

Plaintiffs claim, and the circuit court held, that the charter provision of the city of Plymouth[1] vi-

---

[1] "Except as otherwise provided in this charter, an elector of the city shall be eligible to hold elective or appointive office, if he shall have been a resident of the city for two years immediately prior to the date of his election or appointment to office, and shall not be in default to the city, the county of Wayne, or to any school district located within the city. To be eligible to hold an elective office, a person shall also have been, for a period of two years prior to the date of his election or appointment to office, the owner of property located within and assessed for taxes by the city." City of Plymouth charter, § 4.4.

olates the equal protection and due process clauses of the State and Federal Constitutions.

The issue as to whether a property ownership qualification for public office is constitutionally valid is, however, broader than the Plymouth city charter. CLS 1961, § 340.492 (Stat Ann 1968 Rev § 15.3492), provides a similar qualification for membership on a school board.

## 3. THE PRECEDENTS.

There is no appellate decision in this State on the question of the constitutionality of a property ownership qualification for holding public office.

There are several Michigan cases in which the validity of such provisions is assumed and where the only question is whether the property ownership qualification has been met. *People, ex rel. Godwin,* v. *Board of Education of Grand Rapids* (1878), 38 Mich 95; *Brady* v. *Weissenstein* (1932), 260 Mich 678; *Attorney General, ex rel. Kennedy,* v. *Cisco* (1961), 362 Mich 649.

Defendants cite cases from other jurisdictions holding that property ownership qualifications for public office are valid. *State, ex rel. Fletcher,* v. *Ruhe* (1898), 24 Nev 251 (52 P 274); *State, ex rel. Thompson,* v. *McAllister* (1893), 38 W Va 485 (18 SE 770); *McMillin* v. *Neely* (1909), 66 W Va 496 (66 SE 635); *State, ex rel. Morrison,* v. *Freeland and Harbert* (1954), 139 W Va 327 (81 SE2d 685).

Although there has been some difference of opinion[2] the courts have uniformly held that a property ownership qualification for public office is not unconstitutional.[3]

---

[2] Notably the dissent of Brannon, J., in *State, ex rel. Thompson,* v. *McAllister, supra* at p 449.

[3] 42 Am Jur, Public Officers, § 49, p 918.

Appellees cite recent decisions which have departed from the former uniformity. *Landes* v. *Town of North Hempstead* (1967), 20 NY2d 417 (284 NYS2d 441, 231 NE2d 120), and *Pierce* v. *Village of Ossining* (SD NY, 1968), 292 F Supp 113, a Federal district court case presided over by a three-judge panel in the southern district of New York.

### 4. THE ARGUMENT.

Plaintiffs-appellees argue that the equal protection clause requires that the law deal similarly with persons who are similarly situated. It is said that in this case we deal with two classes of persons, propertied and unpropertied, who are similarly situated with respect to their relation to government and the sharing of governmental powers. Yet in the face of these similarities, the property ownership qualification denies to the unpropertied or to those with property not subject to property tax a share in governmental power.

It is further argued that the property ownership qualification denies to all persons the right to vote for an unpropertied candidate. In support of the claim that such qualification amounts to invidious discrimination, plaintiffs cite the following from the *Landes Case* (p 421):

"Ownership of real property does not render one more interested in, or devoted to, the concerns of the town. In a society such as ours, characterized by its 'mobility' and 'anonymity' (Cox, The Secular City [rev ed, 1966], p 33), a landowner is no more likely to be permanently established in a town—and, by that token, better qualified to govern—than one who is not a property owner. Examples come readily to mind which demonstrate the unrealistic character of the property qualification: an elected town

councilman, suddenly compelled by financial reverses to sell his home and move into an apartment, would be required to resign from office; an apartment dweller who owned a taxpayer[4] in town but who commuted to his place of business in, for instance, New York City and took no interest or part in civic affairs would be fully eligible for town office; and an apartment dweller not owning real property but with a place of business in town and deeply involved in community affairs would be ineligible. All in all, we suggest that it is impossible today to find any rational connection between qualifications for administering town affairs and ownership of real property."

Plaintiffs-appellees also argue by way of analogy from recent decisions of the United States Supreme Court.

It is urged that the activist thrust of such decisions as *Baker* v. *Carr* (1961), 369 US 186 (82 S Ct 691, 7 L Ed 2d 663); *Reynolds* v. *Sims* (1964), 377 US 533 (84 S Ct 1362, 12 L Ed 2d 506); *Harper* v. *Virginia Board of Elections* (1966), 383 US 663 (86 S Ct 1079, 16 L Ed 2d 169); and others, will carry the Supreme Court of the United States into the camp of the plaintiffs.

## 5. THE REASONING.

The application of the equal protection clause to qualifications for holding public office, as opposed to voting, is a step which the United States Supreme Court has not yet taken.

There are new and different problems here. It is easy to say that everyone should have the right to vote. It is not so obvious that everyone should have the right to hold public office.

---

[4] The term *taxpayer* is used in the sense of a building used merely to bring in income enough to pay the taxes.

A qualification for public office is not a regulation under the police power of the sovereign. A regulation establishing a curfew or a speed limit which distinguished between propertied and the unpropertied would deny equal protection of the laws. A law, however, which taxes those who own property and does not tax those who do not own property is not unconstitutional. For the power of government to determine what things or activities are to be taxed is not limited in the same way as the power of government to regulate human activity for the health, welfare, and safety of the community. A qualification for the holding of public office similarly is not such a law as interferes with the personal liberty of our citizens or deprives them of the use and enjoyment of their property.

Courts should not apply, in testing a qualification for public office, the same standards of reasonableness and relationship to purpose as are found in cases dealing with regulations under the police power.

Age limitations have been prescribed for many public officers.[5] Both minimum and maximum ages have been set. Such qualifications are essentially arbitrary, and reflect the choice of constitution-writers and law-makers. The men who wrote the United States Constitution wanted mature presidents. They provided that the president must be 35 years of age. We are told that in the not too far distant future, the majority of Americans will be under 25. Coming to power, this new generation may prefer vigor to maturity, and amend the Constitution to provide a maximum presidential age. The decision will be theirs.

The establishing of qualifications for public office is essentially a political decision. It is peculiarly

5 US Const, Art 1, §§ 2, 3, and Art 2, § 1.

so, since the same majority which establishes the qualification elects the officeholders. If a candidate has the votes to be elected, then he has the votes to change the eligibility requirement; and if he doesn't have the votes to change the qualification, then he does not have the votes to be elected.

In a democracy, the majority rules. By definition, a minority cannot have an equal right to govern.

The majority of the people of Plymouth have established the qualifications for their city commissioners.

It is urged that they had no rational basis to do so. It may be conceded that their reasons are as parochial and intolerant as those advanced by the majority in *State, ex rel. Thompson,* v. *McAllister, supra.*[6]

Still, Plymouth, Michigan, is a sleepy little town, even today. Perhaps it is a backward town, by the standards of those who see American society as "mobile" and "anonymous."

But the issue is whether the courts, from the depths of their urbanity, can impose upon the people

[6] "Experience in municipal matters, and a wise consideration of the question, will convince any unbiased mind that such a law has under it the very best of reasons. The fact that a man owns real estate has little bearing on the question as to whether he is capable of filling an office, but the real-estate owners are the substantial people of any community,—its bone and its sinew,—and there are but few among them that do not have some property pride, and an interest in the welfare and prosperity of their permanent dwelling place. On the other hand, among those not owning real estate belong the floating population,—those who are too trifling and unthrifty to want property, and those who, having wasted their substance in riotous living, and spent their days in idleness are jealous of their neighbors' prosperity, and are ready to tear down, destroy, and scatter broadcast, the results of hard earnings, frugal management, and careful savings. To them, although electors, the prosperity and welfare of the municipality amounts to nothing, for, like the Bedoins of the plains, 'neath the shadows of night they can fold their tents, and silently steal away', while, if there are any among the unfortunate but deserving poor who would make capable officers, their more successful neighbors are ever ready and willing to lend a helping hand, and see that they own the necessary 'ten feet of ground.' " (pp 494, 495.)

of a home-rule city a "purer" form of democracy than they choose for themselves.

A benevolent tyrant thinks he knows what is best for the people. A judicial activist, who is very sure of himself, may have no trouble concluding that the electorate is unreasonable or even irrational.

Today, we consider a suburban town where the people want their commissioners to be taxpayers. Tomorrow, we may have the case of a different kind of municipal corporation in which tenants want to be represented by tenants. The roof of American self-government is big enough for both.

Reversed. No costs, a public question being involved.

DETHMERS, KELLY, and BLACK, JJ., concurred with T. E. BRENNAN, C. J.

ADAMS, J. (*dissenting*). This case involves a provision in section 4.4 of the charter of the city of Plymouth that "to be eligible to hold an elective office, a person shall also have been, for a period of two years prior to the date of his election or appointment to office, the owner of property located within and assessed for taxes by the city." Plaintiff Peter D. Schweitzer, a candidate for the office of city commissioner, failed to meet the property ownership provision. The remaining plaintiffs claim the right to vote for the candidate of their choice.

It is necessary to examine the duties and responsibilities of a city commissioner to determine whether section 4.4 of the city charter of the city of Plymouth has a reasonable relation to city government necessary to sustain such a constitutional classification in the exercise of the elective franchise. Defendants' brief states:

"The members of the city commission have the power to borrow money and issue bonds the payment of which is dependent on tax revenue; specially assess real property; zone the property of the city; adopt a budget and in point of fact, physically tax the property in the city of Plymouth in order to operate local government. It should also be noted that the city commission has the power to condemn private property for public purposes, as well as to control the use of property under its police powers." (Charter references omitted.)

Defendants candidly admit that the classification which is under attack has for its objective "the protection of the citizens of the city of Plymouth, *in* and the preservation *of* their property." (Emphasis added.) They state:

"A complete view of the powers of the city commission demonstrate the tremendous effect that body can have on Plymouth property; condemnation of private property by the exercise of the power of eminent domain; establishment of the use to which property may be put by adoption and amendment of zoning laws; the control of the occupancy and manner of use by regulatory police power ordinances; all this coupled with the power to tax, either generally by the establishment of the ad valorem tax, annually, as the city commission adopts its budget or specially as it undertakes public improvements; is a powerful rationale for the establishment of the property requirement for the office of city commissioner. And, as affidavits filed in this cause indicate, an average of 62.6 per cent of the revenue for the providing of services to the city comes from property tax."

The circuit judge found:

"The city of Plymouth has a 'strong commission' form of government. The commission of the city

of Plymouth wields the entire legislative power vested in the city.  Chapter 5, Plymouth Charter.

"In addition, the commission of the city of Plymouth wields great, albeit indirect, executive power. One of its members serves as mayor.  The commission selects the mayor, who presides over commission meetings and is also the titular and ceremonial head of city government.

"More importantly, the commission selects and at its pleasure removes the city manager, who is the day-to-day administrative head of the executive branch of city government.

"The commission also appoints the city attorney, board of review, personnel service appeal board, and certain other boards and commissions.  The city manager appoints other important city officials, but only with the advice and consent of the city commission.  Chapters 4, 5, 6, and 7, Plymouth Charter.

"Thus in barring Reverend Schweitzer from running for the city commission, the charter has excluded him from an important repository of governmental power.

"There are other effects of section 4.4 of the Plymouth charter which should be briefly examined. Two effects are obvious.

"First, those Plymouth residents who are substantially without property are prevented from running for public office within the city.

"Second, they are also prevented from electing representatives, who, like themselves, are substantially unpropertied.  One would not be surprised to find a belief on the part of unpropertied persons that they could be most adequately represented in government by persons as poor and unpropertied as themselves.

"Poor people are not the only ones who feel the bite of the Plymouth charter.  All residents of Plymouth, rich, poor, or in between, are deprived of a free choice of public representatives.  All the voters of Plymouth, regardless of wealth, are denied the opportunity to have as a representative on the city

commission any person who fails the property test of section 4.4 of the city charter.

"For example, if such a person should emerge who had statesmanlike potential, who was popular with the electorate and anxious to serve his city, he could not run and the voters could not elect him. All voters, regardless of wealth, would be denied an opportunity to support such a candidate.

"Moreover, there may be people of substantial property whose opportunity to run for office is destroyed by the charter. The charter test is ownership of property assessed for taxes in Plymouth. Many forms and kinds of property are not subject to assessment or taxation by municipal units of government. For example, intangible personal property such as bank deposits, corporate stocks, and bonds are not assessed or taxed by the city of Plymouth. CL 1948, § 205.131 *et seq.,* as amended by PA 1964, No 134 (Stat Ann 1960 Rev § 7.556[1] *et seq.*).

"Also much of the tangible personal property located in Plymouth is not assessed or taxed there. CL 1948, § 211.9, as amended by PA 1967, No 259 (Stat Ann 1968 Cum Supp § 7.9) exempts from taxation various kinds of personal property. For the most part, chattels, which are held for personal consumption and enjoyment, are not taxed.

"For example, the seventh paragraph of CL 1948, § 211.9, as amended by PA 1967, No 259 (Stat Ann 1968 Cum Supp § 7.9) *exempts 'household furniture, provisions and fuel to the value of $5,000 to each household.'*

"And other paragraphs in this particular section of our statutes go on to exempt personal property as follows:

" 'Sixth, the library, family pictures, schoolbooks, one sewing machine used and owned by each individual or family, and wearing apparel of every individual.'

"Apparently this exemption is without monetary limit.

"The eighth paragraph of this particular section goes on to exempt 'the working tools of any mechanic not to exceed in value the sum of $500.'

"Also the eleventh paragraph exempts 'personal property of the value not to exceed $500 used by a householder in the operation of a business in his dwelling, or at one other location in the city, township or village where the householder resides.'

"Under CLS 1961, § 257.801, as amended by PA 1967 (Ex Sess), No 3 (Stat Ann 1968 Cum Supp § 9.2501), automobiles held for personal use are exempt from assessment or taxation by city government. So are most boats, particularly pleasure boats. See CLS 1961, § 207.51 (Stat Ann 1960 Rev § 7.281).

"Speaking generally, these exemptions cover much tangible personal property which is not held for commercial use but for the consumption and enjoyment of the owner."

The circuit judge concluded that the property requirement not only disqualified unpropertied persons but persons owning a substantial amount of property in Plymouth which was exempt to them or not taxable.

The only eligibility requirements for the office of governor or lieutenant governor are that a person must have attained the age of 30 years and have been a registered elector in this State for four years next preceding his election.[1] One of the responsibilities of the chief executive of this State is to protect and preserve the property of her citizens.

The basic right to participate in government in Michigan is set forth in article 1, § 1, and article 2, § 1, of the Constitution of 1963. Article 1, § 1, provides:

---

[1] Const 1963, art 5, § 22. See, also, Const 1963, art 4, §§ 7, 8, for eligibility requirements for State legislators.

"All political power is inherent in the people. Government is instituted *for their equal benefit,* security and protection." (Emphasis added.)

Article 2, § 1, provides:

"Every citizen of the United States who has attained the age of 21 years, who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and *qualified to vote in any election except as otherwise provided in this constitution.* The legislature shall define residence for voting purposes." (Emphasis added.)

If the sole concern and purpose of the government of the city of Plymouth was the protection and preservation of property, it might be conceded that the property ownership requirement has some reasonable relationship to that city's governmental objectives but the concern of the city for its citizens does not end at the door of the property owner. It is responsible for the welfare of all its citizens in numerous areas of local governmental activity.

In *Harper* v. *Virginia Board of Elections* (1966), 383 US 663 (86 S Ct 1079, 16 L Ed 2d 169), Justice Douglas delivered the opinion of the Court. He wrote (p 666):

"We conclude that a State violates the equal protection clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard."

And again:

"To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor." (p 668.)

On November 1, 1968, in the case of *Pierce* v. *Village of Ossining* (SD NY, 1968), 292 F Supp 113, a

500    381 Mich 485.    [Feb.

Dissenting Opinion by Adams, J.

three-judge court of the United States district court
for the southern district of New York declared un-
constitutional a State statute that disqualified the
plaintiffs from voting in a village election on the
question of a change in village government from a
mayoral system to a village manager system because
they were not owners "of property in the village
assessed upon the last preceding assessment roll
thereof."

The language of the Court in *Reynolds* v. *Sims*
(1964), 377 US 533 (84 S Ct 1362, 12 L Ed 2d 506), is
especially pertinent to this case:

"But representative government is in essence self-
government through the medium of elected rep-
resentatives of the people, and each and every citizen
has an inalienable right to full and effective par-
ticipation in the political processes of his State's
legislative bodies." (p 565.)

"And history has seen a continuing expansion of
the scope of the right of suffrage in this country.
The right to vote freely for the *candidate of one's
choice* is of the essence of a democratic society, and
any restrictions on that right strike at the heart of
representative government. And the right of suf-
frage can be denied by a debasement or dilution of
the weight of a citizen's vote just as effectively
as by wholly prohibiting the free exercise of the
franchise." (p 555.) (Emphasis added.)

For an application of the above case at the level
of local government, see *Landes* v. *Town of North
Hempstead* (1967), 20 NY2d 417 (284 NYS2d 441,
231 NE2d 120).

In the recent case of *Williams* v. *Rhodes* (1968),
393 US 23 (89 S Ct 5, 10, 21 L Ed 2d 24, 31), Mr. Jus-
tice Black in the opinion of the Court, wrote (p 30):

"The state laws [Ohio's] place burdens on two dif-
ferent, although overlapping, kinds of rights—the
right of individuals to associate for the advance-

ment of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.  Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment.  And of course this freedom protected against Federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States.  Similarly we have said with reference to the right to vote:  'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined.' "

Constitutional rights are not subject to legislative interference.  The proposition was stated by Justice White in the recent case of *Hunter* v. *Erickson* (1969), 393 US 385 (89 S Ct 557, 561, 21 L Ed 2d 616, 623) in this fashion: "The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed."  (p 392.)

I am unable to find any reasonable or rational relationship to the governing of a city that permits the requirement of ownership of property assessed for taxes in order that a person be eligible for the office of city commissioner.  Plaintiff Schweitzer has been denied the opportunity to present himself to the voters as a candidate for the governing body of the city of Plymouth.  The remaining plaintiffs have been completely debarred from their right to associate for the advancement of political beliefs[2] and to cast their votes effectively.  In this respect, the violation of constitutional rights here is even

2 See US Const, Am 1.—Reporter.

more flagrant than in *Williams* where upon compliance with State law those rights could be asserted.

Section 4.4 of the city charter of the city of Plymouth violates the equal protection clauses of the Constitution of the United States and of this State, as well as the First Amendment of the United States Constitution. I vote to affirm the trial judge.

No costs, a public question being involved.

T. M. Kavanagh, J., concurred with Adams, J.

T. G. Kavanagh, J., took no part in the decision of this case.