Rolland Lee **STAPLETON,** William Spaulding, Thomas Leavens, Margaret Kuptz, Jesse Caines, John Hohenadl, Edwin Hughes, Jerry Murley, Plaintiffs,

v.

**CLERK FOR the CITY OF INKSTER and Election Commission for the City of Inkster, Defendants.**

**Civ. A. No. 34614.**

United States District Court,
E. D. Michigan, S. D.

April 29, 1970.

1188

Abdeen M. Jabara, Lafferty, Reosti, Jabara, Papakhian, James, Stickgold & Smith, Detroit, Mich., for plaintiffs.

Albert H. Schlenker, Jr., Inkster Corporation Counsel, Inkster, Mich., for defendants.

## OPINION

FREEMAN, Chief Judge.

This is a suit by Rolland Lee Stapleton, in his capacity as a potential candidate for the office of councilman of the City of Inkster, Michigan, and seven electors of that City, alleging that Section 5.1(a) of the Charter of the City of Inkster is unconstitutional for the reason that it violates their respective rights under the equal protection clause of the federal constitution. Plaintiffs seek a declaratory judgment and a writ in the nature of mandamus, directing the City Clerk to place plaintiff Stapleton's name on the ballot for the April 6, 1970, primary election. Alternatively, plaintiffs seek a declaratory judgment that the term "property" as used in Section 5.1(a) of the City Charter includes both real and personal property.

The complaint in this case was filed on March 16, 1970. In view of the imminence of the primary election and consequent need for an immediate determination of the issues presented, on March 30 the court ruled that Section 5.1(a) of the Charter violated the equal

protection clause and directed that plaintiff Stapleton's name be placed on the ballot. This Opinion sets forth the reasons for that ruling.

I

Section 5.1(a) of the Charter of the City of Inkster reads in relevant part as follows:

"No person shall hold any elective office of the City unless he is and has been a resident and a property owner of the City for at least two years immediately prior to, and was a registered elector on, the last day for filing petitions for such office, * *."

█ It is necessary first to dispose of plaintiff's contention that the term "property" as used in this section includes both real and personal property. If this contention can be sustained, there is no need to decide the more difficult constitutional questions presented.

The Defendant City Clerk claims that the term "property" means only real property and the court agrees with this contention. It seems obvious that no other construction could have been intended by the framers of the Charter. If the term is to include personal property, then it is meaningless, since everyone owns some personal property—if only the clothes on his back.

II

In turning to the more difficult constitutional questions presented by this case, it is first of all pertinent to note what is *not* involved here. Plaintiffs do not challenge the right of the City to impose reasonable qualifications for office such as age, residence, and citizenship. Moreover, it is conceded by defendants that plaintiff Stapleton has met all of the requirements for having his name placed on the primary ballot except that of "being a property owner of the City for two years immediately prior to filing for public office." See Exhibit 1 attached to the complaint. The sole issue before this court is whether the City of Inkster, a home rule city, may require as a qualification for the office of city councilman that the officeholder be an owner of real property for a period of two years prior to the last day for filing nominating petitions for such office without violating the equal protection clause of the federal constitution.

█ It is now established law that a person has

"a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications. The State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." Turner v. Fouche, 396 U.S. 346, 362–363, 90 S.Ct. 532, 541, 24 L.Ed. 2d 567 (1970).

The question remains whether the requirement of Section 5.1(a) that an officeholder own real property for two years in the City is invidiously discriminatory.

█ It is unclear whether the traditional standard or the more exacting "compelling interest" standard should be used to measure this office qualification. Compare McGowan v. Maryland, 366 U.S. 420, 425, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), with Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), and Kramer v. Union Free School District No. 15, 395 U.S. 621, 628, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). The Supreme Court declined to resolve this issue in the *Turner* case, *supra*. After examining the cases cited above and the other authorities, this court has concluded that defendant must demonstrate a "compelling" city interest in order to justify the qualification.

In Kramer v. Union Free School District No. 15, *supra*, the Supreme Court explained the reason for requiring the stricter standard of a "compelling" state interest in cases involving restrictions

on the right to vote, in the following terms:

"Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government.

" * * * Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives. Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest. See Carrington v. Rash, *supra,* 380 U.S. 89, at 96, 85 S.Ct. 775 at 780 [, 13 L.Ed.2d 675].

"And, for these reasons, the deference usually given to the judgment of legislators does not extend to decisions concerning which resident citizens may participate in the election of legislators and other public officials * * Accordingly, when we are reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable. See Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). *The presumption of constitutionality and the approval given 'rational' classifications in other types of enactments are based on an assumption that the institutions of state government are structured so as to represent fairly all the people. However, when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality. And, the assumption is no less*

under attack because the legislature which decides who may participate at the various levels of political choice is fairly elected." 395 U.S. at pp. 626–628, 89 S.Ct. at 1890. (Emphasis added.)

It appears to this court that the reasons given for requiring the compelling interest standard in voting cases are equally applicable to cases challenging qualifications for public office; in both situations the challenge is directed to the assumption that the institutions of state government are structured so as to fairly represent all the people. Thus, the City must demonstrate a compelling interest to justify the ownership of real property in the City as a qualification to hold office and the City does not have the advantage of the usual presumption that the Charter is constitutional.

■ It also appears to the court that the "compelling interest" standard must be applied, since this requirement also burdens the voter plaintiffs' right to vote. It is unquestioned that a voter has a constitutionally protected right to vote for the candidate of his choice and to have his votes counted. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). It is also established, as pointed out previously, that a person has a constitutionally protected right to be considered for public office without the burden of invidiously discriminatory disqualifications. Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). It seems clear to this court that a restriction upon who may be a candidate necessarily affects the efficacy of a person's vote. The effectiveness of the franchise can just as certainly be curtailed by restricting the group from whom candidates may be drawn as by restricting those entitled to cast a vote or by malapportioning a legislative body.

■ It is clear that restrictions on the right to vote must meet the "compelling interest" standard. Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583

(1969); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); and Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). However, since the Supreme Court did decline in *Turner* to determine whether the compelling interest standard should be applied to qualifications to hold office, this court will analyze the real property ownership requirement under both the compelling interest standard and the traditional test for a denial of equal protection.

### III

■ Under the traditional standard, the court must determine "whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective." Turner v. Fouche, *supra*, 396 U.S. at 362, 90 S.Ct. at 541.

The City has urged that the classification imposed here is rational because property owners are less transient than renters and that they have a tendency to take a greater interest in community affairs, as well as other grounds to be discussed later. Such reasoning was anticipated and rejected by the Supreme Court in *Turner*, at p. 364, 90 S.Ct. at 542.

> "Nor does the lack of ownership of realty establish a lack of attachment to the community and its educational values. However reasonable the assumption that those who own realty do possess such an attachment, Georgia may not rationally presume that that quality is necessarily wanting in all citizens of the county whose estates are less than freehold." [citing Leary v. United States, 395 U.S. 6, 32–36, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) in a footnote.]

In this case, the City already has a two-year residence requirement to overcome the problem of transients. There is no rational basis for presuming that non-freeholder candidates for elective city office necessarily lack interest in community affairs.

The City also argues that the powers and duties of the office of councilman as they relate to tax assessments, special assessments, zoning regulations, subdivision control requirements, and property condemned for governmental purposes require that this office be held only by property owners in order to adequately protect owners of real property. This assertion does not withstand scrutiny.

It is to be noted that the City Council is vested with all the general police powers of the City and provides for all municipal services. In the exercise of these powers, the actions of the City Council affect all residents of Inkster equally, whether they are freeholders or not. The Council determines the scope of police and fire protection, the number and location of parks, the construction and maintenance of streets, traffic control, etc.

It should be noted also that according to the affidavit of the Treasurer of Inkster, only 38.7 per cent of the City's revenues were derived from real property taxes in the fiscal year 1969–70. The affidavit of the City Assessor establishes that there are about 10,000 dwelling units in the City, of which 1,620 are rental units, and about 549 additional rental units are under construction. Thus, the end result of this freeholder requirement is to disqualify approximately 16 percent of the residents of Inkster from being considered for public service.[1]

■ It also appears to this court that the freeholder requirement here, although apparently not intended as such, operates as a qualification based on wealth and as such is violative of the equal protection clause. In Landes v. Town of North Hempstead, 20 N.Y.2d 417, 284 N.Y.S.2d

---

1. This court has no way of knowing how many homes, as distinguished from apartments, are rented and the proportion of rental units in relation to the total number of dwelling units in Inkster appears to be rising significantly.

441, 231 N.E.2d 120 (1967), the New York Court of Appeals, in a well-reasoned opinion by Chief Judge Fuld, stated:

"The ownership of land, however, as a prerequisite, a condition precedent, to holding elective town office constitutes an 'invidious discrimination' against nonlandowners, a sort of economic gerrymandering which runs afoul of the equal protection and due process clauses of both Federal and State Constitutions. (Cf. Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, [16 L.Ed.2d 169], *supra;* Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656.) As the Supreme Court observed in the poll tax case, involving the qualifications for voters, 'Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process. Lines drawn on the basis of wealth or property, like those of race * * * are traditionally disfavored.' (Harper v. Virginia State Bd. of Elections, 383 U.S. at p. 668, [86 S.Ct. at p. 1082, supra], * * *)." 284 N.Y.S.2d at 444, 231 N.E.2d at 122.

Also, the freeholder requirement, as a practical matter, is not equally open to all in this case. There are now 10,000 dwelling units in Inkster, but 16 per cent are not, by their nature, capable of being owned by the occupants. Moreover, any assertion that ownership of just one square inch of land within the City will qualify its owner for elective office reduces defendants' argument that property ownership is necessary to protect freeholders to pure levity.

The claim that councilmen must be restricted to owners of real property seems to this court merely another way of saying that non-landowners will not act frugally or responsibly. Indeed, the City argued that non-property holders would be expected to be less sensitive to the impact of increased municipal spending upon the taxes of the owners of real property. As to this argument, the Supreme Court, in the *Turner* case, made the following relevant observations:

"It cannot be seriously urged that a citizen in all other respects qualified to sit on a school board must also own real property if he is to participate responsibly in educational decisions, without regard to whether he is a parent with children in the local schools, a lessee who effectively pays the property taxes of his lessor as part of his rent, or a state and federal taxpayer contributing to the approximately 85% of the Taliaferro County annual school budget derived from sources other than the board of education's own levy on real property." 396 U.S. at pp. 363–364, 90 S.Ct. at 542.

Also, in the *Landes* case, the New York Court of Appeals observed:

"Underlying the *Becraft* [Matter of Becraft v. Strobel, 274 N.Y. 577, 10 N.E.2d 560] decision that the legislation in question was valid was the rationale that owners of real property 'may be expected to be careful and economical in administering' town affairs. (Special Term opinion of DOWLING, J., 158 Misc. 844, 850, 287 N.Y.S. 22, 30). At a time when the taxation of its real property was the chief concern of a town, this reasoning may have had some validity, although we fail to see how it may be said that qualities of carefulness or frugality were ever the monopoly of those owning real property. Indeed, most town problems affect owners and tenants alike: zoning, highways, parks, fire, water and sewage districts, traffic regulations—to name but a few.

"Ownership of real property does not render one more interested in, or devoted to, the concerns of the town. In a society such as ours, characterized by its 'mobility' and 'anonimity' * * *, a landowner is no more likely to be permanently established in a town—and, by that token, better qualified to govern—than one who is not a property owner." 284 N.Y.S.2d at 444, 231 N.E.2d at p. 122.

■ This court notes that the Michigan Supreme Court in the recent case of Schweitzer v. Plymouth City Clerk, 381 Mich. 485, 164 N.W.2d 35 (1969), cert. denied, 397 U.S. 906, 90 S.Ct. 896, 25 L.Ed.2d 86 (1970), held that property ownership requirements were constitutionally permissible. This court is unable to agree for two reasons. At page 491, 164 N.W.2d at page 38 of its opinion, the Michigan Supreme Court stated:

"The application of the equal protection clause to qualifications for holding public office, as opposed to voting, is a step which the United States Supreme Court has not yet taken."

On January 19, 1970, the Supreme Court did take that step in the case of Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567.

Also, 381 Mich., at p. 492, 164 N.W.2d at p. 38, the Michigan Supreme Court stated:

"Courts should not apply, in testing a qualification for public office, the same standards of reasonableness and relationship to purpose as are found in cases dealing with regulations under the police power."

The implication in the context of this statement is that a lesser standard should be applied. This court knows of no authority in any court for such a proposition, and the Michigan Supreme Court . cited none. The equal protection clause of the fourteenth amendment applies to all state actions, and it does not apply in a watered down version to some forms of state action. See also Note, "Equal Protection and Property Qualifications for Elective Office." 118 U. of Pennsylvania Law Rev. 129 (1969).

■ Any doubts that might remain as to the constitutionality of a property ownership requirement disappear when the "compelling interest" standard is used to measure its effect. Not only are other means adopted by the City and, indeed, the State of Michigan, to protect property owners from excessive taxa-

tion, but the effect of limiting those qualified to hold the office of councilman to members of this class has a substantial overkill effect. The disqualification of non-property owners from office is not limited to disqualification from an office having to do only with the taxation of property. It disqualifies them from being considered for public service to exercise the many other and far-reaching powers granted to the City Council of Inkster. The property ownership requirement also applies to *all* elective offices, and even then the candidate must own property for two years prior to election, irrespective of his length of residence in Inkster.

It may be noted in City of Phoenix v. Kolodziejski, 313 F.Supp. 209 (D.Ariz. 1969), cert. granted 397 U.S. 903, 90 S.Ct. 930, 25 L.Ed.2d 85, a three-judge district court held that the equal protection clause invalidated a freeholder requirement for voting in municipal elections to authorize the issuance of general obligation bonds. It seems to this court that if a state may not validly protect municipal property owners by limiting the franchise in bond issuance elections to freeholders, it must follow that Inkster cannot limit membership on its City Council to freeholders for such purpose. Cf. Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969).

For the reasons stated above, this court concludes that, measured by either standard, the property ownership qualification for public office of Section 5.1 (a) violates the equal protection clause and is not tailored with sufficient precision to achieve the desired goal. See Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); and Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

An appropriate order may be submitted.