Carmen C. **CHIMENTO**

v.

**Robert L. STARK, Secretary of State of New Hampshire.**

**Civ. A. No. 72–182.**

United States District Court,
D. New Hampshire.

Jan. 22, 1973.

Philip R. Currier, Smith, Welts & Currier, Nashua, N. H., for plaintiff.

Howard B. Myers, Asst. Atty. Gen., for the State of New Hampshire.

Before CAMPBELL, Circuit Judge, and GIGNOUX and BOWNES, District Judges.

## OPINION

BOWNES, District Judge.

This is an action brought pursuant to 28 U.S.C. §§ 2281 and 2284 wherein plaintiff requested a Three-Judge Court to declare unconstitutional and permanently enjoin the enforcement of Part Second, Article 42, of the New Hampshire Constitution.

A Three-Judge Court was duly convened, and a hearing held on November 10, 1972.

The question presented is whether that section of Part Second, Article 42,[1] of the New Hampshire Constitution which sets forth a seven year durational residency requirement as a condition of eligibility for the office of Governor violates the Equal Protection Clause of the Fourteenth Amendment, the First Amendment, or the constitutional right of unrestricted interstate travel.

## STIPULATED FACTS

Carmen C. Chimento is a citizen of the United States who has resided in New Hampshire since June 30, 1969. On June 30, 1972, the Secretary of State received Mr. Chimento's Declaration of Candidacy for the democratic nomination for the office of Governor. His eligibility for Governor was questioned because of his failure to have been a resident of the State for seven years, and this suit was instituted on August 25, 1972.

Plaintiff's petition for a preliminary injunction to enjoin the holding of the primary election on September 12, 1972, pending a resolution of this question was denied on September 7, 1972. Chimento's name did appear on the ballot for the primary election at which he failed to obtain the Democratic Party nomination.[2] Plaintiff then decided to run for

1. Part Second, Article 42, of the New Hampshire Constitution reads in pertinent part as follows:
 . . . And no person shall be eligible to this office [Governor], unless, at the time of his election, he shall have been

an inhabitant of this state for seven years next preceding . . . .

2. Mr. Chimento received 943 Democratic and 2 Republican votes in the September 12, 1972 primary. There were a total of

Governor as an independent candidate. The State of New Hampshire, through its Attorney General, took the position that, under the New Hampshire Constitution, Chimento could not assume the office of Governor even if elected, and instructed the Secretary of State not to accept his filing papers as an independent candidate for the November 7, 1972, general election. Plaintiff sought a temporary restraining order to enjoin the Secretary of State from not accepting his filing papers which was denied on September 28, 1972. Plaintiff has stated that he intends to seek election to the office of Governor of New Hampshire during the 1974 primary and general elections, and the State has indicated that it will not allow him to file as a candidate for Governor in 1974 since, at that time, he will still not have met the residency requirement of the New Hampshire Constitution.

## FINDINGS AND RULINGS

This case is one of first impression. No court has considered the validity of a durational residency requirement for the office of Governor of a state, although several have recently considered equal protection challenges to durational residency requirements as a condition of eligibility for candidacies to lesser offices.[3]

Plaintiff's principal constitutional challenge to the New Hampshire Constitution rests upon the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. It is well settled that there exists "a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications," and a state "may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." Turner v. Fouche, 396 U.S. 346, 362–363, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970). What constitutes "invidious discrimination" depends upon the facts within the context of the case being decided. The United States Supreme Court has developed two basic tests, one of which is to be applied in passing on challenges of this character. This preliminary issue is usually posed in terms of the traditional "reasonable basis" test versus the stricter "compelling state interest" test. We must, therefore, initially decide upon the appropriate standard of review. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

The choice of standard depends upon "the interests affected and the classification involved." Dunn v. Blumstein, supra, 405 U.S. 335, 92 S.Ct. 999. In general, if the challenged law directly affects a "fundamental" or "basic" right or draws lines which result in a "suspect classification,"[4] the proponents of the law must make a "clear showing that the burden imposed is necessary to protect a compelling and substantial governmental interest." Dunn v. Blumstein, supra, 405 U.S. 341, 92 S.Ct. 1002;

---

47,783 ballots cast for the office of Governor in the Democratic Primary and 93,910 ballots cast for the office of Governor in the Republican Primary. These results are on file with the Secretary of State of New Hampshire.

3. See Stapleton v. Clerk for City of Inkster, 311 F.Supp. 1187 (E.D.Mich.1970); Hadnott v. Amos, 320 F.Supp. 107 (M.D. Ala.1970), aff'd without opinion, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971); Bolanowski v. Raich, 330 F. Supp. 724 (E.D.Mich.1971); Green v. McKeon, 335 F.Supp. 630 (E.D.Mich. 1971); Mogk v. City of Detroit, 335 F. Supp. 698 (E.D.Mich.1971); McKinney

v. Kaminsky, 340 F.Supp. 289 (M.D.Ala. 1972); Wellford v. Battaglia, 343 F. Supp. 143 (D.Del.1972); Draper v. Phelps, 351 F.Supp. 677 (W.D.Okl. 1972); Gangemi v. Rosengard, 44 N.J. 166, 207 A.2d 665 (1965); Hayes v. Gill, 473 P.2d 872 (Hawaii, 1970); DeHond v. Nyquist, 65 Misc.2d 526, 318 N.Y.S. 2d 650 (S.Ct., Albany Cty.1971); Zeilenga v. Nelson, 4 Cal.3d 716, 94 Cal.Rptr. 602, 484 P.2d 578 (Calif.1971); and State ex. rel. Gralike v. Walsh, 483 S.W.2d 70 (Mo.1972).

4. E. g., a classification based on race, religion, national origin, or personal wealth.

Wellford v. Battaglia, 343 F.Supp. 143, 145 (D.Del.1972). Semantics aside, the question is resolved judicially by determining what is more important to our form of government; the rights protected by the state law in question or the rights infringed by it.

■■ We, therefore, turn to a determination of that issue. While the right to run for public office may not be as important and fundamental as the right to vote,[5] any limitations imposed by a state on the ability of candidates to obtain a position on the ballot necessarily places:

> . . . burdens on two different, although overlapping, kinds of rights— the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms. Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968).

This interrelation between restrictions on the right to candidacy and restrictions on the right to vote was further noted by the Supreme Court in Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed. 2d 92 (1972):

> . . . the Court has not heretofore attached such fundamental status to

candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. At pages 142–143, 92 S.Ct. at 855–856.

Where, as here, the law in question poses a barrier to a candidacy of a not insubstantial segment of the community[6] and, to that degree, limits the voters in their choice of candidates, we hold that the stricter standard of review should be applied.[7] Moreover, application of the "compelling interest" test is required in this case because plaintiff also contends that the durational residency requirement impinges on the exercise of his basic constitutional right to travel interstate. See United States v. Guest, 383 U.S. 745, 759, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); and Dunn v. Blumstein, *supra*, 405 U.S. 341–342, 92 S.Ct. 1002.

■ In applying the "compelling interest" test, this court must closely scrutinize Part Second, Article 42, to see if it can withstand constitutional attack. The "compelling state interest" standard of review, however, does not require absolute perfection or necessity. The propriety of legal lines which are drawn and classifications which are made cannot depend on precise mathematical

---

5. The right to participate in representative government (i. e., the right to vote) does seem to some degree more fundamental than the right to represent others in that process (i. e., the right to serve in public office). Perhaps this is so because running for office is self-limiting (i. e., only a comparatively few want to run), whereas voting is a right in which *all* should participate.

6. See pages 11–15 of the plaintiff's brief for a statistical analysis of the number of people who have not lived in New Hampshire for seven years.

7. For cases that dealt with the issue of durational residency requirements for public office and applied the "compelling interest" test, see Stapleton v. Clerk for City of Inkster, 311 F.Supp. 1187 (E.D. Mich.1970); Hadnott v. Amos, 320 F.

Supp. 107 (M.D.Ala.1970), aff'd without opinion, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971); Bolanowski v. Raich, 330 F.Supp. 724 (E.D.Mich. 1971); Green v. McKeon, 335 F.Supp. 630 (E.D.Mich.1971); Mogk v. City of Detroit, 335 F.Supp. 698 (E.D.Mich. 1971); McKinney v. Kaminsky, 340 F. Supp. 289 (M.D.Ala.1972); Wellford v. Battaglia, 343 F.Supp. 143 (D.Del. 1972); Draper v. Phelps, 351 F.Supp. 677 (W.D.Okl.1972); and Zeilenga v. Nelson, 4 Cal.3d 716, 94 Cal.Rptr. 602, 484 P.2d 578 (1971). Contra see Gangemi v. Rosengard, 44 N.J. 166, 207 A.2d 665 (1965); Hayes v. Gill, 473 P.2d 872 (Hawaii 1970); DeHond v. Nyquist, 65 Misc.2d 526, 318 N.Y.S.2d 650 (S.Ct. Albany Cty. 1971); and State ex rel. Gralike v. Walsh, 483 S.W.2d 70 (Mo. 1972).

equations. As Mr. Justice Marshall in Dunn v. Blumstein, *supra,* stated:

. . . Thus phrased, the constitutional question may sound like a mathematical formula. But legal "tests" do not have the precision of mathematical formulas. The key words [*necessary* to promote a *compelling* governmental interest] emphasize a *matter of degree:* that a heavy burden of justification is on the State, and that the statute will be closely scrutinized in light of its asserted purposes [Emphasis added.] At pages 342–343, 92 S.Ct. at page 1003.

In deciding whether a law violates the Equal Protection Clause, this court must look to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of that classification. Dunn v. Blumstein, *supra,* 405 U.S. 335, 92 S.Ct. 995. Cf. Williams v. Rhodes, *supra,* 393 U.S. 30, 89 S.Ct. 5.

A state's right to impose restrictions on one seeking public office is a power reserved to the states under the Tenth Amendment of the United States Constitution. However, if the state's exercise of this right invades an individual's constitutional rights, the restrictions become unconstitutional unless there is a showing of a compelling state interest justifying them. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969).

The plaintiff contends that the seven year residency requirement for the office of Governor severely limits his ability to participate in the election process, deprives him of equal protection of the laws, limits his right to seek and hold public office, and restricts his right to travel freely interstate.

The compelling state interest asserted by the State is that of maintaining a responsive and responsible government through the democratic process. Defendant advances two specific justifications in support of the seven year residency requirement: first, to ensure that the chief executive officer of New Hampshire is exposed to the State and its people, thereby giving him familiarity with and awareness of the conditions, needs, and problems of both the State of New Hampshire and the various segments of the population within the State, while at the same time giving the voters of the State an opportunity to gain by observation and personal contact some firsthand knowledge of the candidates for Governor; and second, to prevent frivolous candidacy by persons who have had little previous exposure to the problems and desires of the people of New Hampshire. The first purpose has a particular relevance in a small and comparatively sparsely populated state such as New Hampshire.[8]

In weighing the alleged infringements of the plaintiff's constitutional rights against the State's justification for the seven year residency requirement, the observation of Mr. Chief Justice Burger in Bullock v. Carter, *supra,* is especially appropriate:

In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters. At page 143, 92 S.Ct. at page 856.

The residency requirement, therefore, must be closely scrutinized as to its effect on the entire democratic election process. Its impact on the voters, as well as on the plaintiff, must be assessed.

When examined in a realistic light, we conclude that the seven year residency requirement acts only as a minimal infringement upon the ability of the plaintiff to participate in the election process and that its limiting effect upon

---

8. The Office of State Planning has determined the 1972 resident population of New Hampshire to be 778,566 as of June 30, 1972. The land area of New Hampshire is 9,033 square miles.

the voters' choice of candidates is more hypothetical than real. Any residency requirement limits to some extent the choice of candidates available to the voters. But this is the least of the restrictions limiting candidate availability. The method of nominating candidates, minimum age requirements, and the high cost, even in New Hampshire, of a gubernatorial campaign, are also factors that restrict the number of candidates available to the voters. Moreover, the seven year period does not act as an outright ban on anyone's candidacy for Governor; rather, it delays the eligibility of a candidate to the office of Governor until a time when he has been a resident of the State for seven years. While we recognize that seven years may be a long wait for one aspiring to the office of Governor, it is not a complete barrier to that office. There are lesser but nonetheless important offices that a putative Governor might well fill during the waiting period with benefit both to his own political career and the people of the State.

Two important and distinguishing aspects of this case ought to be noted. First, the seven year durational residency requirement applies only to the office of Governor and State Senator,[9] the highest elective offices in the State of New Hampshire. The rationale asserted by the State for such a residency

requirement carries far greater weight than if it applied to candidacies for lesser public offices. In this regard, many of the recent cases which have struck down durational residency requirements as violative of the Equal Protection Clause are to some extent inapposite.[10] A second and important difference between this case and other recent cases is that the residency requirement in question is contained in the Constitution of the State. No other case has yet considered a durational residency requirement which appeared in a state constitution; all the other cases dealt with state statutes or local ordinances.

New Hampshire's seven year durational residency requirement for those seeking the office of Governor was not intended originally as and is not an invidious method of denying newcomers the right to be a candidate. From the very beginning of this Nation, residency requirements have been thought to be necessary means of achieving the goal of having knowledgeable and qualified people in high public office. The Constitution of the United States requires that the President be a resident of the United States for fourteen years. (Article II § 1).[11]

The seven year residency requirement first appeared in the New Hampshire Constitution of 1784. At that time the chief executive officer was the "Presi-

---

9. Part Second, Article 29, of the New Hampshire Constitution provides for a seven year durational residency requirement as a condition of eligibility for the office of State Senator.

10. Hadnott v. Amos, 320 F.Supp. 107 (M.D.Ala.1970), aff'd without opinion, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971) (Office of State Circuit Judge); Bolanowski v. Raich, 330 F. Supp. 724 (E.D.Mich.1971) (Mayor); Green v. McKeon, 335 F.Supp. 630 (E.D. Mich.1971) (all elective/appointive city offices); Mogk v. City of Detroit, 335 F.Supp. 698 (E.D.Mich.1971) (City Charter Revision Commission); McKinney v. Kaminsky, 340 F.Supp. 289 (M.D. Ala.1972) (County Commissioner); Wellford v. Battaglia, 343 F.Supp. 143 (D.Del.1972) (Mayor); and Zeilenga v.

Nelson, 4 Cal.3d 716, 94 Cal.Rptr. 602, 484 P.2d 578 (1971) (Office of County Supervisor). See also Stapleton v. Clerk for City of Inkster, 311 F.Supp. 1187 (E.D.Mich.1970) (involving property ownership requirement for the office of city clerk).

11. The debates in the Constitutional Convention of 1787 indicate that one of the primary reasons why durational residency requirements were inserted in the Federal Constitution was to insure that those running for the designated office had sufficient opportunity to gain the necessary knowledge about the problems which they might be called upon to resolve. See Notes of Debates In The Federal Convention of 1787 Reported by James Madison, W. W. Norton and Company, pp. 406–407, 1966.

dent" of New Hampshire. The name of "President" was changed to "Governor" to denote the chief executive in the Constitution of 1791, but the seven year requirement remained unchanged. According to the New Hampshire historian, Jeremy Belknap, the Constitution of 1784 was modeled almost entirely after the Massachusetts Constitution of 1780,[12] which was written primarily by John Adams.[13] At the time the founding fathers were fashioning the Federal Constitution (1787), they had available, if not as models at least as samples, the Constitutions of Massachusetts (1780), and New Hampshire (1784).

The plaintiff is asking us to strike down a constitutional provision that was drawn by the framers of the New Hampshire Constitution. While the dead hand of the past should not be allowed to shape the future, something more than disappointment of one frustrated candidate is needed to erase a constitutional provision that goes back to 1784 and was never challenged until now.

While history and custom are not the final test of any constitutional question, a survey of the state of the law throughout the Nation helps put the issue in proper perspective. Durational residency requirements for the office of Governor are the rule rather than the exception. Forty-three states currently have durational residency or citizenship requirements as conditions of eligibility for the office of Governor.[14] Twenty-nine states require five or more years, ten states require seven or more years, and two states require ten years.

■ We conclude that the residency requirement of the New Hampshire Constitution does promote legitimate state interests. It ensures that the chief executive officer of New Hampshire is exposed to the problems, needs, and desires of the people whom he is to govern, and it also gives the people of New Hampshire a chance to observe him and gain firsthand knowledge about his habits and character. While the length of the residency requirement may approach the constitutional limit, it is not unreasonable in relation to its objective. It does not seriously impair the participation of the plaintiff in the election process and has only a negligible impact on the voters' right to have a meaningful choice of candidates for Governor. If the residency requirement for Governor is to be eliminated, it should be accomplished by the *voters* through the constitutional amending process. We hold, therefore, that Part Second, Article 42, of the New Hampshire Constitution is not violative of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

■ We consider and reject plaintiff's contention that the seven year residency requirement abridges rights guaranteed to him and others similarly situated under the First Amendment. This restriction does not deprive anyone of his right to association or of the freedom of expression of his political views. While theoretically there may be a class of persons who are prevented from running for the office of Governor of New Hampshire because they have not lived

---

12. Chapter II, Section I, Article II, of the 1780 Constitution provides as a condition of eligibility for the office of Governor that " . . . at the time of his election, he shall have been an inhabitant of this Commonwealth for seven years next preceding . . . . "

13. Source: The Constitution of New Hampshire, Gault and Spaulding, Manchester, N. H., 1904, p. 26.

14. Louisiana, Missouri (10 years); Arkansas, Alabama, Alaska, Massachusetts, New Hampshire, New Jersey, Pennsylvania, Tennessee (7 years); Delaware, Georgia, Kentucky (6 years); Arizona, California, Florida, Indiana, Maine, Maryland, Mississippi, Nebraska, New Mexico, New York, North Dakota, South Carolina, Texas, Utah, Virginia, Wyoming (5 years); Michigan, Vermont (4 years); Hawaii, Illinois, Oregon (3 years); Colorado, Idaho, Iowa, Montana, Nevada, North Carolina, South Dakota (2 years); Minnesota (1 year); Oklahoma requires that one be a qualified elector for 10 years (Okl.Const., Art. VI § 3).

here for seven years, this right is not of the type that comes within the expansive mantle of protection of the First Amendment. The "right of qualified voters . . . to cast their votes effectively" referred to in Williams v. Rhodes, *supra*, remains inviolate. While an isolated few may be *temporarily* precluded from seeking the office of Governor, this cannot be said to adversely affect the democratic election process or the voters' participation therein.

 There remains to be dealt with the plaintiff's contention that the durational residency requirement impinges on the exercise of his basic constitutional right to travel freely interstate. It is well settled that the right to travel is a fundamental right as it relates to the right to vote. Dunn v. Blumstein, *supra*. However, because of the nature of the residency requirement, the relationship between it and the right to travel is indirect and remote. We agree with Judge Doyle, concurring in Draper v. Phelps, 351 F.Supp. 677 (W.D. Okl.1972):

> . . . the right to public office can[not] be equated to the right to vote in relationship to the right to travel. Candidacy for public office is quite different from voting, and one does not travel from one place to another contemplating that he will offer himself to the voters for election to state office.

Candidate durational residency requirements do not "penalize" the right to travel or force a person to choose between that right and a "basic" or "fundamental" right.[15] It cannot be seriously argued that the inability to run for Governor is a real impediment to interstate travel. In Dunn v. Blumstein, *supra,* the residency requirement for voters in fact disenfranchised all those who moved into the State within the proscribed time limit. The members of such a class were and had the potential of being numerous. While the Governorship of New Hampshire may be a coveted prize, it is one that is seriously sought after by only a very few. Not only is this the first challenge to the New Hampshire residency requirement but, as far as we know, it is the first constitutional challenge to any gubernatorial residency requirement in any state. Mr. Chimento may portend a wave of future gubernatorial candidates, but right now the wave is not even a ripple. We hold that the relationship between the seven year residency requirement and the right to travel is far too attenuated to constitute any infringement of that right.

Petition dismissed. Judgment for the defendant.

So ordered.

CAMPBELL, Circuit Judge (concurring).

I concur with the result and with most of what is said, and well said, in the opinion of the Court. I have difficulty, however, with the holding that the "stricter standard of review," i. e., the so-called "compelling interest test" applies in all its rigor. See Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 *supra*. *Cf*. Mr. Justice Harlan, dissenting, Shapiro v. Thompson, 394 U.S. at 655, 89 S.Ct. 1322, 22 L.Ed. 2d 600.*

Actually what I believe the Court is doing (and quite properly so) is to apply ordinary equal protection standards— weighing the plaintiff's right to hold office against the countervailing right of the body-politic to establish reasonable nondiscriminatory standards for those who would aspire to represent it in highest office. Given the absence of "invid-

---

15. See Fn. 5 *infra*.

* Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), applied the compelling interest test in dealing with an invidious economic barrier to candidacy. Nothing in *Bullock* would seem to require extension of the stricter standard to a limitation of the present character which, as the Court amply demonstrates, is reasonably related to experience that might be thought necessary for service in the state's highest office.

"ious" discrimination, the reasonableness of the limitation, and the *obvious* interest of the body-politic in those who hold its highest office, the result would seem sound even if John Adams had not had a hand in drafting the disputed constitutional provision.

But I think the difficulty with meaningful application of the compelling interest test suggests the continuing relevance of Mr. Justice Harlan's criticism of the extension of that standard, Shapiro v. Thompson, *above,* 659–662, 89 S.Ct. 1322.