# Department of Justice Views on the Constitution Adopted by the Constitutional Convention of the Virgin Islands

[The following memorandum, initially drafted in the Office of Legal Counsel at the request of the Assistant Attorney General for Legislative Affairs, presents the Department of Justice's views on certain provisions of the constitution adopted by the 1980 constitutional convention of the Virgin Islands. This constitution was approved by Congress for submission to the people of the Virgin Islands by Pub. L. No. 97-21, 95 Stat. 105 (1981), but was subsequently rejected in a referendum. As of the date of publication of this volume, the Virgin Islands do not have a constitution. The following analysis of the provisions of the rejected constitution discusses important and recurring constitutional and legal issues arising in the context of federal-territorial relations.]

September 9, 1980

## MEMORANDUM OPINION FOR THE DIRECTOR, OFFICE OF MANAGEMENT AND BUDGET

This responds to your request for the views of the Department of Justice on the constitution adopted by the constitutional convention of the Virgin Islands on July 31, 1980.

Section 2(a) of the Act of October 21, 1976, Pub. L. No. 94-584, 90 Stat. 2899, 48 U.S.C. preceding § 1541 ("Enabling Act"), authorized the legislature of the Virgin Islands to call a constitutional convention to draft a constitution for the local self-government of the people of the Virgin Islands within the existing territorial-federal relationship. Section 2(b) of the Act provided that such constitution shall: (1) recognize and be consistent with the sovereignty of the United States and the supremacy of the provisions of the Constitution, treaties and laws of the United States applicable to the Virgin Islands, including the provisions of the Organic Act of 1936 of the Virgin Islands and the Revised Organic Act of the Virgin Islands of 1954 which do not relate to local self-government; (2) provide for a republican form of government, consisting of three branches; (3) contain a bill of rights; (4) deal with the subject of those provisions of the Revised Organic Act of the Virgin Islands of 1954, as amended, which relate to local self-government; and (5) provide for a system of local courts consistent with the provisions of the Revised Organic Act of the Virgin Islands, as amended.

Sections 4 and 5 of the Enabling Act provide that the constitutional convention shall submit to the Governor of the Virgin Islands a

759

proposed constitution which shall comply with the requirements of § 2(b). The Governor in turn shall submit the constitution to the President of the United States, who shall transmit it to Congress within 60 calendar days together with his comments. The constitution shall be "deemed approved" by Congress within 60 days after its transmittal by the President, unless prior to that date Congress, by Joint Resolution subject to the approval of the President, has approved, modified, or amended it. The draft constitution as approved or modified by Congress shall then be submitted to the qualified voters of the Virgin Islands in a referendum for acceptance or rejection.

## I. Recognition of the Sovereignty of the United States and Supremacy of the Constitution and Laws of the United States

In contrast to the 1978 constitution,[1] this constitution does not expressly comply with the requirement of § 2(b)(1) of the Enabling Act that it recognize the sovereignty of the United States and the supremacy of its Constitution and of those of its laws that are applicable to the Virgin Islands. Indeed, Article V, § 1 of the constitution refers to the supremacy of the constitution of the Virgin Islands and of the laws enacted under it without any reference to the supremacy of the Constitution and laws of the United States.

If the Enabling Act did not contain this express requirement, the failure of the constitution to recognize the sovereignty of the United States and the supremacy of its Constitution and laws would not have any substantial legal consequences because they are implied in the Organic Act and flow from the territorial relationship. Indeed, few if any state constitutions specifically refer to the sovereignty of the United States or the supremacy of its Constitution and laws. The same is true of the recently adopted constitution of the Northern Mariana Islands.

Moreover, the preamble to the constitution declares that the Virgin Islands assume "the responsibilities of self-government in political union with the United States"; in the draft official analysis of the constitution,[2] the comments on the preamble contain the statement in "accordance with section 2(b) of U.S. Public Law 94–584 (October 21, 1976) [the Enabling Act] recognition is given to the sovereignty of the United States over the Virgin Islands"; and finally, Article V, § 1 of the constitution provides that the legislative power of the Virgin Islands "shall extend to all subjects . . . consistent with . . . the Constitution and laws of the United States applicable to the Virgin Islands." During the Senate hearings on the 1978 Guam constitution,[3] which also failed

---

[1] The constitution adopted by the 1978 constitutional convention of the Virgin Islands was "deemed approved" by Congress but was defeated in the referendum.

[2] We have not as yet received the final text of those comments as approved by the constitutional convention.

[3] The 1978 Guam constitution was also defeated in a referendum.

to recognize expressly the sovereignty of the United States and the supremacy of its Constitution and laws, the Department of the Interior and the Department of Justice concluded that analogous provisions in the Guam constitution and its official analysis constituted at least substantial compliance with § 2(b)(1) of the Enabling Act.[4] In particular, the Department of Justice took the position that, as the result of nearly 200 years of history, the term "political union with the United States" necessarily carries with it recognition of the sovereignty of the United States and the supremacy of its laws.[5] The Department of the Interior indicated that the definition of the legislative power of Guam carried with it the recognition of the supremacy of the Constitution and laws of the United States.[6] The Department of Justice concluded:

> Indeed, it seems to us that this statement in the preamble is sufficient to overcome any contention that the explicit or tacit approval of the constitution by Congress would have the effect of relinquishing the sovereignty of the United States over Guam and the supremacy of Federal laws.[7]

On the basis of this history, we conclude that this proposed constitution is in substantial compliance with § 2(b)(1) as regards this point.

## II. Bill of Rights

The Bill of Rights, Article I of the constitution, does not appear to be in conflict with the Enabling Act or any pertinent federal law. However, we believe that some of its provisions and related sections in other parts of the constitution have not been drafted with adequate clarity and precision. As President Carter pointed out on April 28, 1978, in his comments on the Guam constitution (Pub. Papers of Jimmy Carter 795, 796–97 (1978)), such vagueness may result in litigation that could burden or curtail effective local government.

### 1. Article I, § 1: Fundamental Rights

The first sentence of this section would provide that "the dignity of the human being is inviolable." There is no definition of the scope of the elusive term "dignity." It is not clear whether the section is directed only at governmental action or also at private action, and whether the first sentence is supposed to be defined by the two sentences following it. Moreover, the relationship between the equal

---

[4] *Constitution of Guam,* Hearing before the Committee on Energy and Natural Resources, United States Senate, 95th Cong., 2d Sess. 60–67 (1978) ("Hearing").

[5] *Id.,* at 64.

[6] *Id.,* at 61.

[7] *Id.,* at 64.

protection clause in the second sentence and the prohibition against discrimination in the third sentence is unclear.

## 2. *Article I, § 3: Right of Privacy*

This section seems to create an absolute right of privacy that cannot be limited or defined by statute. Again, it is not clear whether this clause is directed only at governmental action or also at private action. Moreover, while under Article I, § 4 of the Virgin Islands constitution the right to know provided for in that section would yield to the right of privacy, the constitution does not attempt to solve potential conflicts between the "absolute" right of privacy under § 3 and the freedom of speech and of the press guaranteed by Article I, § 2 of the Virgin Islands constitution and the First Amendment to the Constitution of the United States.[8] *Cf., New York Times* v. *Sullivan,* 376 U.S. 254 (1964).

## 3. *Article I, § 4: Right to Know*

This section would authorize any person to examine any public document and observe the deliberations of any agency of the government subject to reasonable limitations, as may be provided by law. It is not clear whether the term "reasonable limitation as may be provided by law" refers only to statutory limitations to be enacted in the future or whether it includes existing statutory and common law restrictions on the access to documents and deliberations. If the former interpretation is the correct one, all public documents, including classified documents, and all deliberations of governmental bodies, including courts, grand juries, and petit juries, would be open to the public pending the enactment of the pertinent legislation. Considering the controversial nature of the subject matter, the adoption of such legislation may take some time. And even then there may be complex litigation as to whether the statutory limitations are reasonable.

## 4. *Article I, § 5: Searches and Seizures*

The third sentence, which prohibits the interception of communications unless authorized by warrant, would in its breadth appear to require the use of warrants even for the one-party consensual interception of communications. In view of the preemption of this field by chapter 119 of Title 18, United States Code, this section is plainly limited to prosecutions under local law and should not affect federal prosecutions.

---

[8] The Bill of Rights for the Virgin Islands embodied in its Organic Act expressly extends the First Amendment to the Constitution of the United States to the Virgin Islands with "the same force and effect there as in the United States or in any State of the United States." 48 U.S.C. § 1561.

## 5. *Article I, § 10(e): Child Labor*

This subsection prohibits child labor in certain instances but does not define the term "child" by reference to age.

## 6. *Article I, § 15: Implementation of Rights*

The second sentence gives the Senate the power to provide by law for the implementation and enforcement of this article. This sentence raises doubts whether and to what extent the provisions of the Bill of Rights are self-executing, and whether they require statutory implementation in order to become effective. This point should be clarified.

## 7. *Article IX, § 1(b): Free Education*

The third sentence of this subsection provides that public elementary and secondary education shall be "essentially" free. The word "essentially" is undefined and may well become the source of needless and time-consuming litigation.

## 8. *Article X, § 7: Right to a Healthful Environment*

According to this section, every person has the right to a healthful environment subject to reasonable limitations, as provided by law. This right may be enforced "against any party subject to reasonable limitations as may be provided by law." The effect of this broad provision is to confer constitutional dimensions to the law of nuisances and to invite litigation to determine whether statutory limitations on this constitutional right are or are not reasonable.[9]

### III. Citizenship

Article III, § 1 of the constitution defines the term "Virgin Islander" as a person born in the Virgin Islands or a descendant of at least one parent who was born in the Virgin Islands. The term Virgin Islander does not appear anywhere else in the constitution; therefore, its inclusion would not appear to have any legal consequences. On the other hand, its presence could encourage the enactment of discriminatory legislation favoring Virgin Islanders.

. Section 2, Article III defines the term "citizens of the Virgin Islands." We must comment adversely on this section because the definition of that term is preempted by federal law and because § 2 is in conflict with that law.

---

[9] We have been advised that this section is based on Article XI of the Illinois Constitution of 1970. There has been a substantial amount of litigation involving that article, but in the time available we have been unable to assess the possible implications of that litigation in the context of the Virgin Islands constitution assuming, *arguendo*, that the Virgin Islands' courts would interpret this provision in a way similar to the interpretation given by the Illinois courts to their provision.

The first sentence of the first section of the Fourteenth Amendment provides that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State in which they reside." Concededly, the direct applicability of the Fourteenth Amendment to the territories has not been settled as yet. *See, e.g., District of Columbia* v. *Carter,* 409 U.S. 418, 423 (1973); *Examining Board* v. *Flores de Otero,* 426 U.S. 572, 601 (1976); *Torres* v. *Puerto Rico,* 442 U.S. 465, 469–71 (1979).[10] However, the Bill of Rights of the Virgin Islands contained in the Organic Act specifically extends to the Virgin Islands the Privileges and Immunities Clause of the second sentence of § 1 of the Fourteenth Amendment with "the same force and effect there as in the United States or any State of the United States." 48 U.S.C. § 1561. One of the privileges and the immunities of a citizen of the United States is the privilege to be a citizen of the State in which he establishes his residence. The *Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 80 (1872). Citizenship in a state or a territory such as the Virgin Islands to which the Privileges and Immunities Clause of the Fourteenth Amendment extends accordingly is preempted by federal law and exists without reference to or interference by state constitutions or laws. *United States* v. *Hall,* 26 Fed. Cas. 79, 81 (C.C.S.D. Ala. 1871) No. 15,282. As the court held in the *Slaughter-House Cases, supra,* at 95, "[a] citizen of a State is now only a citizen of the United States residing in that State."

Moreover, § 2 of Article III is inconsistent with the Citizenship Clause of the Fourteenth Amendment. That clause has been interpreted as follows:

1. Only a citizen of the United States can be a citizen of a State or Territory. The *Slaughter-House Cases, supra,* at 95; *United States* v. *Hall, supra,* at 81; *Colgate* v. *Harvey,* 296 U.S. 404, 427 n.3 (1935); *Sharon* v. *Hill,* 26 F. 337, 343 (C.C.D. Cal. 1885); *Factor* v. *Pennington Press, Inc.,* 230 F. Supp. 906, 909 (N.D. Ill. 1963);

2. A citizen of the United States becomes a citizen of the State or Territory in which he resides *immediately* upon the establishment of his residence therein. *Morris* v. *Gilmer,* 129 U.S. 315, 328 (1889); *Paudler* v. *Paudler,* 185 F.2d 901, 902 (5th Cir. 1950), *cert. denied,* 341 U.S. 920 (1951); and

3. A citizen of a State or Territory loses his citizenship therein when he establishes another residence. *Paudler* v. *Paudler, supra,* 185 F.2d at 902 and authorities cited therein.

Section 2 is inconsistent with those federally established rules of state citizenship. Section 2(a) would provide that all persons born in the

<hr>

[10] We note that the Department of Justice did not participate as a party or *amicus curiae* in these cases.

Virgin Islands and subject to its jurisdiction are citizens thereof. It does not comply with the federal requirement that citizenship in a State or Territory is contingent on U.S. citizenship [11] and on residence in the Territory.

Section 2(b) would provide that citizens of the United States who were born outside the Virgin Islands become citizens of the Virgin Islands only after they have been domiciled there for at least one year. This is inconsistent with the federal constitutional requirement that a citizen of the United States becomes the citizen of a State or Territory immediately upon the establishment of his residence therein. [12] The one-year residence requirement for the acquisition of Virgin Islands' citizenship is of particular importance in view of Article IV, § 1 of the constitution, pursuant to which the right to vote is conditioned on Virgin Islands' citizenship. The combination of Articles III, § 2(b) and IV, § 1 thus has the practical effect of subjecting the right to vote in the Virgin Islands to a one-year durational residence requirement. The Supreme Court has found such a requirement to be unconstitutional. *Dunn* v. *Blumstein*, 405 U.S. 330 (1972).

Section 2(c) would in effect provide Virgin Islands' citizenship to all those who are United States citizens pursuant to § 306(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1406(a)(1). The subsection fails to recognize that Virgin Islands' citizenship is conditioned on residence in the Virgin Islands.

Section 2(d) would provide for Virgin Islands' Citizenship contingent upon the enactment of appropriate federal legislation, presumably legislation granting United States citizenship to certain persons born in the Virgin Islands who resided outside the United States between January 17, 1917 and June 28, 1932 (§ 306 of the Immigration and Nationality Act, 8 U.S.C. § 1406). This subsection is defective because it does not limit Virgin Islands' citizenship to those who reside in the Virgin Islands and does not require continued United States citizenship. Furthermore, this subsection would deny Virgin Islands' citizenship to persons who are citizens or subjects of another country, although they are citizens of the United States.

---

[11] Pursuant to § 306 of the Immigration and Nationality Act, 8 U.S.C. § 1406, not all persons born in the Virgin Islands prior to February 25, 1927, are citizens of the United States and some persons born in the Virgin Islands as United States citizens may subsequently have lost that citizenship under § 347 of the Immigration and Nationality Act, 8 U.S.C. § 1481.

[12] Our attention has been directed to § 5(a) of the Puerto Rico Federal Relations Act, 48 U.S.C. § 733a, which imposes a one-year residence requirement on the acquisition of Puerto Rican citizenship by citizens of the United States. This provision was enacted by Congress (Act of March 4, 1927, § 2, 44 Stat. 1418) and not by a Territory to which the Privileges and Immunities Clause of the Fourteenth Amendment has been extended. We express no opinion whether Congress could constitutionally impose a one-year residence requirement in the Virgin Islands.

## IV. Composition of the Senate

Article V, § 2 provides that the Senate, the unicameral legislature of the Virgin Islands, shall consist of fifteen members, that there shall be no more than four senators elected at-large, and that the legislative districts of St. Croix, St. John, and St. Thomas shall each be represented. Since the number of inhabitants of St. John is much smaller than that of the other two islands, the requirement that there shall be at least one Senator from St. John potentially violates the one-man-one-vote rule.[13] Whether such a violation would ultimately occur would likely turn on specific facts in existence at that time. The one-man-one-vote rule does not require absolute equality. It permits some deviations designed to recognize the integrity of political subdivisions, or the recognition of natural or historical boundary lines. *See, e.g., Reynolds* v. *Sims,* 377 U.S. 533, 574–75, 579–81 (1964); *Swann* v. *Adams,* 385 U.S. 440, 444 (1967). *See also* S. Rep. No. 433, 94th Cong., 1st Sess. 69 (1975) (discussing with approval a similar departure from the one-man-one-vote rule in § 203(c) of the Covenant with Northern Mariana Islands, Pub. L. No. 94–241, 90 Stat. 265, 48 U.S.C. § 1681 note).

Article V does not establish a term for the senators and does not provide that their terms are to be determined by statute.

## V. Residence Requirement for the Governor and Lieutenant Governor

Article VI, § 3(e) of the constitution provides that the governor and lieutenant governor must have been domiciled in the Virgin Islands for fifteen years, five of which must immediately precede the date of taking office. This provision exceeds by one year the residency requirement for the President of the United States (U.S. Const. Art. II, § 1, cl. 4) and by one-half the longest existing residence requirement for state governors.[14]

The validity of this provision is questionable. The Supreme Court has held that candidates for public office "do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications." *Turner* v. *Fouche,* 396 U.S. 346, 362 (1970); *Bullock* v. *Carter,* 405 U.S. 134, 142–44 (1972). In *Illinois Election Board* v. *Socialist Workers Party,* 440 U.S. 173, 185 (1979), the Court pointed out that where the access to the ballot is concerned [15]

---

[13] We are not aware of any reported case specifically applying the one-man-one-vote rule to the Territories. The Virgin Islands' Bill of Rights, however, specifically extends the Equal Protection Clause of the Fourteenth Amendment to the Virgin Islands to have the same force and effect there as in a State. 48 U.S.C. § 1561.

[14] According to *Chimento* v. *Stark,* 353 F. Supp. 1211, 1217 (D.N.H. 1973), *aff'd* 414 U.S. 802 (1973), in 1973, 43 states had residence or citizenship requirements for the office of governor: ranging from ten years (Louisiana, Missouri, and Oklahoma) to one year (Minnesota).

[15] *Bullock* v. *Carter, supra,* at 142–43, explained that in the area of placing burdensome limitations on the qualification of candidates, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."

the State, even where it seeks to protect a legitimate interest, has to adopt the least drastic means to achieve that end.

The Supreme Court has not as yet passed on durational residence requirements for the holding of office. It has summarily affirmed three decisions which upheld five- to seven-year residence requirements for the offices of state senator and state governor. *Chimento* v. *Stark, supra,* (seven years; state governor); *Kanapaux* v. *Ellisor* (D.S.C. unreported), *aff'd* 419 U.S. 891 (1974) (five years; state governor); *Sununu* v. *Stark,* 383 F. Supp. 1287 (D.N.H. 1974), *aff'd* 420 U.S. 958 (1975) (seven years; state senator).

The official analysis of the constitution gives the following reasons for the fifteen-year residence requirement:

> While this domiciliary requirement is longer than that for similar offices in the States of the Union, it is intended to insure to the greatest extent possible familiarity with the particular problems of the Virgin Islands. Such familiarity is not as easily acquired as it might be in the continental United States, among other reasons, due to the Virgin Islands' status as an unincorporated territory of the United States and to its geographical, historic, social, economic position and unique culture as a group of small islands in the Eastern Caribbean.

In *Chimento, supra,* the district court similarly justified the seven-year residency requirement for the Governor of New Hampshire by reference to the need of that officer to be familiar with and exposed to the conditions, problems, and needs of the State and the various requirements of its population. The court, however, conceded that the seven-year requirement "may approach the constitutional limit." 353 F. Supp. at 1217. It may be significant, at least under the *Chimento* court's analysis, that in 1972, New Hampshire had nearly 780,000 inhabitants and covered a land area of 9,033 square miles, *id.* at 1215 n.8, while according to the 1970 census, the Virgin Islands had 62,000 inhabitants and covered 133 square miles.

On the other hand, there are several instances in which federal courts have struck down residence requirements for state or local officials. Thus, the Eighth Circuit, in *Antonio* v. *Kirkpatrick,* 579 F.2d 1147, 1151 (8th Cir. 1978), held that a ten-year residency requirement for the office of State Auditor for the State of Missouri constituted a denial of equal protection and did not bear a rational relationship to a legitimate state end. The district court, in *Billington* v. *Hayduk,* 439 F. Supp. 975, 979 (S.D.N.Y.), *aff'd on other grounds,* 565 F.2d 824 (2d Cir. 1977), invalidated "as impermissible under the Equal Protection Clause" a five-year residence requirement for the office of County Executive for Westchester County, New York. According to the 1970 census, that county had 984,000 inhabitants and covered 443 square miles. The district

court, in *Alexander* v. *Kammer*, 363 F. Supp. 324 (E.D. Mich. 1973), held that a five-year residence requirement for the Office of City Commissioner of the City of Pontiac, the population of which is similar to that of the Virgin Islands, was not supported by a compelling governmental interest. And in *Brill* v. *Carter*, 455 F. Supp. 172 (D. Md. 1978), the district court held unconstitutional a four-year residence requirement for the office of councilman for Anne Arundel County (300,000 inhabitants, 423 square miles).[16]

The argument supporting the fifteen-year requirement would be that the responsibilities of the Governor—even of a small Territory—differ substantially from those of the head of a county—even of a large one— and that the conditions in the Virgin Islands are quite different from those that prevail on the mainland. These considerations would support an extended durational residence requirement if the latter is based, as is assumed in many cases on the need of the prospective official to acquaint himself with the problems of the area and its inhabitants and to have extended exposure to the electorate. These points, however, are counterbalanced, at least in part, by the small size of the Virgin Islands and its population. We therefore believe there is every reason to question whether the courts will uphold a residence requirement that is more than twice as long as the New Hampshire seven-year period, which the *Chimento* court, *supra*, had characterized as probably "approach[ing] the constitutional limit."

On the other hand, we do not believe that the various five-year residence requirements provided for in the constitution should give rise to serious constitutional problems. *See, e.g.,* Article V, § 4(e) (senator); Article VII, § 6(b) (judge); Article XI, § 4(b) (auditor general).

## VI. Judicial Branch

Article VII, §§ 1 & 2 of the constitution provide for an appellate court. This provision is in conflict with § 2(b)(6) of the Enabling Act, pursuant to which the "system of local courts provided for in the constitution must be consistent with the Revised Organic Act of the Virgin Islands." The pertinent provisions of the Revised Organic Act, §§ 22 & 23, 48 U.S.C. §§ 1612, 1613 do not provide for a local appellate court; appeals from the local courts go to the federal district court.

Article VII, § 2 contains defects in addition to its being inconsistent with the Enabling Act. The last sentence provides that appeals from decisions of the appellate court on federal questions will go to the United States Court of Appeals for the Third Circuit unless Congress provides otherwise. The United States courts of appeals, however, are purely statutory courts and have only such jurisdiction as is conferred on them by Congress. *See, e.g., Gialde* v. *Time, Inc.,* 480 F.2d 1295,

---

[16] The opinion contains an analysis of many pertinent decisions. 455 F. Supp., at 175.

1298 (8th Cir. 1973). A territorial constitution therefore cannot confer appellate jurisdiction on a United States court of appeals. Consequently, there would be no federal forum for the review of decisions of the appellate court involving federal questions. This raises a problem similar to that involved in *Guam v. Olsen*, 431 U.S. 195, 201–04 (1977). The Supreme Court held in *Guam* that in the absence of a "clear signal from Congress," a Territory cannot establish a court if its decisions involving federal questions are not reviewable by a court established under Article III of the Constitution.[17] Hence, even if § 2(b)(6) of the Enabling Act had not prohibited the establishment of an appellate court, the Virgin Islands still could not create such a court in the absence of *federal* legislation providing for the review of its decisions involving federal questions in an Article III court.[18]

The judicial provisions of the constitution raise an additional problem. Section 5 of the Transitional Schedule would establish an interim appellate court consisting of the two district judges for the Virgin Islands and a chief judge appointed pursuant to the provisions of the constitution. According to the constitution, the appellate court would have several not strictly judicial functions, such as to promulgate reapportionment plans (Article V, § 3(b)), to sit as a court of impeachment (Article V, § 12), and to determine questions involving the disability of the Governor and Lieutenant Governor (Article VI, § 9(b)). Since territorial judges are not Article III judges, they could be vested with nonjudicial functions. Nevertheless, the involvement of federal judges in those delicate local political issues may become a source of embarrassment. Moreover, since the appellate court would act as an administrative body in those situations, its decision could conceivably be subject to judicial review in the federal district court, composed of the same judges who handed down the decision in their capacity as members of a territorial judicial body performing nonjudicial functions.

Article VII, § 4 establishes a commission to deal with judicial misconduct and disability. In view of its serious impact on judicial independence, this section should have been drawn with greater precision. It lacks provisions for the selection of the commission and for the qualification of its members, as well as any standards for the discipline, censure, suspension, removal, and compulsory retirement of judges. The section provides for the "appeal" of decisions of the judicial commis-

---

[17] Indeed, the Court indicated that constitutional issues might be presented if Congress sought to deny litigants in a local territorial court access to an Article III court for the apppellate review of local-court decisions. 431 U.S. at 204.

[18] The second sentence of Article VII, § 2 provides that the decisions of the appellate court on non-federal questions shall be final, unless federal law provides for their review by the Supreme Court of the United States. In our view, it is up to Congress to determine which federal court, if any, shall review cases decided by the Virgin Islands appellate court which do not involve federal questions. If Congress should decide that there should be such review, it would generally be more appropriate that it be had, at least initially and as a matter of right, in the court of appeals rather than in the Supreme Court.

sion. In case of actions taken by the commission against appellate judges, recusations may result in a lack of quorum in the appellate court, or require under the necessity doctrine the participation of judges who ordinarily would have to disqualify themselves in view of their connection or involvement with the subject matter of the appeal. This problem, however, is inherent in judicial discipline proceedings and not confined to the Virgin Islands. The implementing legislation could provide for the temporary assignment to the appellate court of trial court judges to sit in lieu of disqualified appellate judges.

### VII. Tax Administration and Tax Exemption of Territorial Bonds

Article XI, § 2 provides that:

> Laws shall be enacted to administer and enforce the income tax and the federal tax laws applicable to the Virgin Islands.

This section must be read in the context of § 2(b)(1) and (4) of the Enabling Act, which limits the constitution to subject matters relating to local self-goverment.

The Virgin Islands presently operates under a so-called "mirror system" of taxation with the Internal Revenue Code administered and enforced by the Virgin Islands as a territorial income tax. Act of July 12, 1921, § 1, 42 Stat. 123 (48 U.S.C. 1397). *Dudley* v. *Commissioner of Internal Revenue,* 258 F.2d 182 (3d Cir. 1958). Under the present law a constitutional provision to enact territorial laws to administer and enforce this territorial income tax would not be objectionable. There are, however, indications that the income tax will be "federalized" in the Virgin Islands. President Carter proposed in his Message on Federal Territorial Policy of February 14, 1980, Pub. Papers of Jimmy Carter 317, 322 (1980), that legislation be enacted making the Internal Revenue Code directly applicable to the territories for income tax purposes and providing that the Internal Revenue Service, rather than the territories, be responsible for its administration and enforcement. The Department of the Treasury has drafted a proposed Territorial Tax Act to implement the presidential message which is presently under consideration by the Office of Management and Budget. Legislation to that effect has been introduced in Congress. *See* S. 2017, 96th Cong., 1st Sess. (1979). We have also been advised that a pertinent provision may be inserted in the current Territorial Omnibus Bill now pending in the House of Representatives. Should this legislation be enacted, the income tax laws would cease to be a matter of self-government in the Virgin Islands and the reference in this section to the income tax laws would become inconsistent with the Enabling Act.

To the extent that Article XI, § 2 would provide for the enactment of legislation to administer and enforce "the federal tax laws applicable

to the Virgin Islands," the section deals with a subject matter which does not relate to self-government; consequently it violates the terms of the Enabling Act.

The second paragraph of Article XI, § 3 would exempt the bond issues of the Virgin Islands, and specifically the interest thereon, from taxation by the Federal Government, any State, Territory, or the District of Columbia. The exemption of the bond issues of the Virgin Islands from taxes imposed by the Federal Government or the States, Territories, or the District of Columbia clearly is not a matter of local self-government and therefore not authorized by the Enabling Act. (*See* §§ 2(b)(1),(d)). Only Congress can grant such tax exemption.

## VIII. Continuation of Laws

Section 3 of the Transitional Schedule provides:

> Laws, executive orders, and regulations . . . that are inconsistent with this Constitution shall be void to the extent of such inconsistency.

This sentence does not in terms limit its scope to laws, executive orders, and regulations relating to matters of local self-government. It would be unauthorized if it purported to apply to matters over which the Federal Government retained jurisdiction. The draft official analysis of the constitution [19] states that this section does not cover laws, executive orders, or regulations that are beyond the authority of the Virgin Islands, such as federal laws. The need to rely on the legislative history to ascertain the scope of a constitutional clause, however, is an undesirable drafting technique, especially in light of the frequently adhered to canon of statutory construction which prohibits the use of interpretative materials where a text appears to be unambiguous on its face.

## IX. Summary and Effect of the "Deemed" Approval of the Constitution

In summary, the constitution does not expressly comply with the requirements of the Enabling Act to recognize the sovereignty of the United States and the supremacy of its Constitution and laws. Moreover, it raises the following substantial legal issues: (1) questions regarding Virgin Islands' citizenship; (2) the durational residence requirements for the Governor and Lieutenant Governor; (3) the appellate court; and (4) the fiscal provisions. In addition, some of its provisions are drawn so loosely as to invite vexatious and possibly paralyzing litigation. In this category are the provisions guaranteeing the inviolability of the dignity of the human being, the absolute right of privacy, and the right to a healthful environment.

---

[19] *See* note 2, *supra*.

In 1978, Congress did not take any action on the constitutions drafted by the constitutional conventions of Guam and the Virgin Islands within the 60-day period provided for in § 5 of the Enabling Act. The two constitutions accordingly were submitted to the voters of Guam and the Virgin Islands, respectively, and both of them were defeated. In view of the possibility that Congress again will fail to pass a joint resolution modifying the previously mentioned legal defects of the constitution, it appears appropriate to consider the legal consequences of the "deemed" approval of the constitution resulting from congressional failure to act.

Basically, Congress can take legal action only in the manner provided for in Article I, § 7 of the Constitution, i.e., by the concurrence of both Houses to a bill or resolution and its presentation to the President. Inaction of Congress therefore cannot have any legal effect, except as, in this case, as the occurrence of a condition which permits the submission of the constitution to the qualified electors of the Virgin Islands. Taking this view, the inaction of Congress would not have any curative effect on the defects of the constitution.

The result, however, would be no different if it were assumed *arguendo* that the omission of Congress to object to the failure of the constitution to comply with the requirements of the Enabling Act has the effect of waiving that noncompliance. Any such waiver would logically be limited to the provisions of the Enabling Act itself. It could not override constitutional requirements such as those involved in the issues relating to the Virgin Islands' citizenship and the durational residence requirements of the Governor or Lieutenant Governor. Similarly, such waiver could not override other existing statutes or serve as a substitute for the enactment of a statute. Thus, in connection with the appellate court issue, it could possibly be argued that the "deemed" approval of the constitution overcomes the requirement of the Enabling Act that the court system be consistent with the existing one, hence, that the constitution could provide for an appellate court. The supposed waiver, however, could not have the effect of granting a federal appellate court jurisdiction to review the decisions of the Virgin Islands' appellate court. That can be done only by positive legislation. Again, the supposed waiver could not override or modify the existing statutes providing for the administration of federal tax laws by federal agencies, or take the place of a statute granting Virgin Islands bonds exemption from federal or state taxation.

ALAN A. PARKER
*Assistant Attorney General*
*Office of Legislative Affairs*