Norman M. ROBERTSON, John Coiro, Eugene Kulick, Gary Colletti, Jay R. Schwartz, and Dennis E. Gonzalez, Plaintiffs,

New Jersey Democratic State Committee Communication Workers of America, AFL–CIO, Latino Action Network, Latino Coalition of Monmouth County, Latinas United for Political Empowerment Political Action Committee, and Women's Political Caucus of New Jersey, Plaintiff–Interveners

v.

Larry BARTELS, Richard Codey, Sonia Delgado, Thomas Giblin, Lewis Greenwald, Bonnie Satson Coleman, in their official capacities as Members of the State of New Jersey Apportionment Commission, the State of New Jersey Apportionment Commission, Deforest B. Soaries, Jr., Secretary of State of New Jersey, and John Farmer, Attorney General of the State of New Jersey, Defendants.

Civ. No. 01–2024 (DRD).

United States District Court,
D. New Jersey.

June 26, 2012.

---

60. 212 F.R.D. 470, 472 (D.Del.2003).

James A. Robertson, Esq., Kalison, McBride & Jackson, P.A., Warren, NJ, Ira W. Mintz, Esq., Adam M. Gordon, Esq., Weissman & Mintz LLC, Somerset, NJ, for Plaintiff–Interveners.

Robert L. Clifford, Esq., McElroy, Deutsch and Mulvaney, Morristown, NJ, Leon Joseph Sokol, Esq., Sokol, Behot & Fiorenzo, Esqs., Hackensack, NJ, Robert E. Levy, Esq., Scarinci Hollenbeck, Lyndhurst, NJ, Robert T. Lougy, Esq., Division of Law & Public Safety, Donna Kelly, Esq., Office of Attorney General of New Jersey, Trenton, NJ, for Defendants.

## OPINION

DEBEVOISE, Senior District Judge.

This case raises two significant issues:

First, did this Court err when, in 2001, it held that the one-year durational residency requirement to run for New Jersey State Senate and General Assembly contained in Article IV, Section 1, Paragraph 2 of the New Jersey State Constitution violates the Fourteenth Amendment of the United States Constitution and enjoined the New

Jersey Attorney General and Secretary of State from enforcing that provision? *See Robertson v. Bartels,* 150 F.Supp.2d 691 (D.N.J.2001)

Second, did the New Jersey State Supreme Court exceed its powers when it rejected the *Robertson* ruling on the grounds that (1) this Court erroneously decided the constitutional issue and (2) this Court's injunction only bound the New Jersey Attorney General and Secretary of State? *See In re Contest of November 8, 2011 General Election of Office of New Jersey General Assembly, Fourth Legislative District,* 210 N.J. 29, 40 A.3d 684 (2012)

## I. BACKGROUND

### A. The Robertson Ruling

Every decade, New Jersey's Apportionment Commission redraws the legislative map of the state's Legislative Districts, producing a new map that differs in significant ways from that of the previous decade. After the 2001 Apportionment Commission adopted a plan redistributing New Jersey's Legislative Districts, several plaintiffs claimed, as part of a broader challenge to the apportionment plan, that the one-year district residency requirement violated the Equal Protection Clause of the Fourteenth Amendment.

A three-judge panel assembled pursuant to 28 U.S.C. § 2284 and referred the Equal Protection Claim to this Court, which held that, based on a strict scrutiny analysis, the one-year district residency provision violated the Fourteenth Amendment.

Article IV, § 1, ¶ 2 of the New Jersey Constitution provides:

No person shall be a member of the Senate who shall not have attained the age of thirty years, and have been a citizen and resident of the State for four years, and of the district for which he shall be elected one year, next before his election. No person shall be a member of the General Assembly who shall not have attained the age of twenty-one years and have been a citizen and resident of the State for two years, and of the district for which he shall be elected one year next before his election. No person shall be eligible for membership in the Legislature unless he be entitled to the right of suffrage.

In its opinion, the Court noted that federal courts had ruled in different ways on the residency requirement issue, observing that "[t]he weighing process in each case is fact sensitive," but that here "[a] fundamental right is at stake and it is necessary to weigh against its impairment the government interests asserted in support of the classification." *Robertson,* 150 F.Supp.2d at 695.

The Court then noted the three interests advanced by the State in furtherance of the one-year residency requirement: (1) the one-year requirement allows the people of New Jersey the necessary opportunity to become familiar with a potential candidate; (2) it prevents political carpet bagging; and (3) it provides a candidate the opportunity to become familiar with the issues and concerns that are important to the people he or she seeks to represent. *Id.* at 696. Reviewing the circumstances of the plaintiffs in the case, the Court found that "the reasons the State advances to justify the one-year residency requirement are particularly uncompelling," *id.* at 697, and consequently that "New Jersey's one-year residency requirement for candidates for the State Senate and State Assembly does not survive a strict scrutiny analysis." *Id.* at 698.

In doing so, the Court explained:

The State is divided into forty districts from each of which there are elected one Senator and two Assembly members. The cities of Newark and Jersey City encompass several districts. Geographical regions of the State consist of many districts. As demonstrated by the recent redistricting that followed the year 2000 census, the boundaries of these districts are not firmly established. Rather they are subject to revision each ten years to ensure that they meet one-person one-vote requirements and other constitutional and statutory mandates.

\* \* \*

The lack of substance to the State's interest in the one-year residency requirement becomes more apparent when one considers the circumstances that prevail in New Jersey's two major cities—Newark and Jersey City. Each is split into three separate legislative districts. District lines run down the middle of streets and through the heart of local neighborhoods. Population mobility is high in these cities, particularly in Newark which has a high percentage of poor and minority residents. Simply by moving across the street a person could find himself or herself subject to the one-year residency requirement.

*Id.* at 697, 698.

The Court also found unavailing the State's reliance on *Sununu v. Stark,* 383 F.Supp. 1287 (D.N.H.1974) (three judge panel), *aff'd,* 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975) and *Chimento v. Stark,* 353 F.Supp. 1211 (D.N.H.1973) (three judge panel), *aff'd,* 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973), two cases where the Supreme Court summarily affirmed the decisions of three judge district courts that upheld the seven-year residency requirement contained in the New Hampshire Constitution for state governor and state senator. This Court distinguished those two cases on two grounds. "First the seven year durational residency requirement" in those cases "applies only to the Office of Governor and State Senator, the highest elective offices in the State of New Hampshire," while the one-year durational residency requirement in New Jersey "relates not to the principal State wide offices of the State ... [but] to officials elected from political subdivisions of much smaller geographical dimensions, the precise boundaries of which are subject to periodic revision." *Robertson,* 150 F.Supp.2d at 698, 699. Second, whereas "the seven year residency requirement first appeared in the New Hampshire Constitution of 1784 and was modeled almost entirely after the Massachusetts Constitution of 1780, which was written primarily by John Adams," the one-year durational residency requirement for a legislative district, although it appears in the New Jersey constitution, "is of much more recent vintage than New Hampshire's (dating from 1947) and lacks the venerable heritage of New Hampshire's charter." *Id.* at 698–99.

Consequently, the Court entered an order permanently enjoining the New Jersey Attorney General and Secretary of State from enforcing that provision. For nearly 10 years, the State of New Jersey complied with that injunction and did not require legislative candidates to establish that they met the New Jersey Constitution's residency requirement.

**B. The New Jersey Supreme Court Ruling**

In 2011, Gabriela Mosquera decided to run for the New Jersey Assembly in the 4th Legislative District. She had moved from the 7th District to the 4th District 10 months prior to the November 2011 election. Although she moved to the 4th District less than a year prior to the election,

she was certified as a candidate by the Secretary of State in accordance with this Court's injunction. The results of the November 8, 2011 election were as follows:

| | |
|---|---|
| Paul D. Moriarty (Democrat) | 21,086 |
| Gabriela Mosquera (Democrat) | 18,907 |
| Shelley Lovett (Republican) | 14,351 |
| Patricia Fratticioli (Republican) | 14,000 |
| Tony Celeste (Independent) | 1,767 |

On December 1, 2011, Lovett filed an Election Challenge Petition, pursuant to N.J.S.A. 19:29-1 to -14, alleging that Mosquera was not constitutionally qualified to represent the 4th District, having resided there for less than one year prior to her election. Mosquera moved to dismiss the petition. The Attorney General represented that she considered herself enjoined by *Robertson* from enforcing Article IV, Section 1, Paragraph 2 of the New Jersey Constitution, stating that while his position had "always been that the constitutional provision was constitutional," her office considered itself to be "enjoined from enforcing [the provision]" by *Robertson*. On January 5, 2012, holding that the residency requirement was constitutional as applied to the 2011 District 4 Assembly election and that *Robertson* did not bar its consideration of the dispute, the trial court issued an order annulling Mosquera's certificate of election, setting aside the November 8, 2011 election in the 4th District as to Mosquera only, and enjoining Mosquera from taking office.

It is unnecessary to describe the proceedings in the trial court and the Appellate Division of the Superior Court that followed upon the trial court's January 5, 2012 order because, on January 13, 2012, the New Jersey Supreme Court, on its own motion, certified the case, ordered expedited briefing, and stayed the judgment of the trial court insofar as it directed the selection of an interim successor.

The Supreme Court heard argument on January 27, 2012, which resulted in a 4–3 decision on February 16, 2012. The majority opinion, of course, is the opinion of the Court and this Court will refer to it herein as the "Opinion."

At the outset, the Opinion addressed "the threshold question of whether we are barred from considering the constitutional question at all in light of the *Robertson* decision . . ." *In re Contest*, 40 A.3d at 693. In doing so, the Court noted the indisputable principle that "a state court is not barred from addressing federal constitutional questions about state statutes, and perforce federal constitutional challenges to our State Constitution, notwithstanding a lower federal court ruling on the subject. . . . While comity requires that we give due respect to the holding of the federal district court in *Robertson*, ultimately the courts of this state, up to and including this Court, and the trial and intermediate federal courts possess an independent ability to address federal constitutional issues." *Id.* (citations omitted). What the Opinion did not mention in the opening observation was the fact that there was in place a federal court injunctive order, of nearly 10 years' duration, enjoining the New Jersey Attorney General and Secretary of State from enforcing the one-year durational residency requirement.

Not until the end of the Opinion did the Court address the injunction designed to protect important federal constitutional rights, stating, among other things:

The injunction, in fact is rather narrow. It enjoins only the Attorney General and the Secretary of State, and their agents, leaving every other person—including candidates, voters, and the Courts of this State—entirely free to disregard it

and to continue to expect that a long-standing provision of our Constitution will be honored.

\* \* \*

In our view, this case cannot end here but rather must proceed further, and we must rely on the parties to pursue such necessary action. In view of the complicated situation presented by the outstanding federal injunction against the Attorney General and the Secretary of the State, the parties should apply to the federal district court or file a petition for a writ of certiorari to the United States Supreme Court to resolve the lingering principled conflict that exists between our declaration of the constitutionality of Article IV, Section 1, Paragraph 2 of the New Jersey constitution and the federal injunction, as well as the practical effects of the differing conclusion.

*Id.* at 712, 713.

Having disposed of the threshold question of the potentially inhibiting effect of the *Robertson* opinion and the existence of the injunction, the majority Opinion turned "to the fundamental issue in this case, which concerns the validity of the durational residency requirement for membership in the New Jersey General Assembly . . ." *Id.* at 692.

The Opinion is an articulate recital of the reasons why the Court disagrees with *Robertson's* conclusion that the one-year requirement violates the Equal Protection Clause of the United States Constitution. It notes at the outset that, "[c]ontrary to the *Robertson* court's mistaken impression that the durational residency requirement is of recent vintage, the requirement can be traced back to the earliest days of the Republic. The first New Jersey Constitution, signed on July 1, 1776, contained a one-year residency requirement for members of the General Assembly." *Id.* This is unquestionably correct. What is of recent vintage was the 1966 amendments to the New Jersey Constitution, motivated by *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and the reapportionment process that takes place every ten years that must meet the one-person one-vote requirement and other constitutional and statutory mandates, resulting in whole towns being moved to other districts.

Addressing the contention that the durational residency requirement is facially unconstitutional, the Court applied the standard set forth in *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987): "[A] statute must be upheld if it can be shown to operate constitutionally in some, even if not all or most, instances." *In re Contest,* 40 A.3d at 694 (quotation and citations omitted). This, according to the Opinion, applies with particular force to a constitutional provision.

Turning to the federal equal protection issue, the Opinion notes that "[t]he starting point for any equal protection analysis is to determine the standard of review, or level of scrutiny, that should be applied to the challenged classification." *Id.* at 695. The Opinion engaged in a thorough examination of the United States Supreme Court and other court cases that dealt with the question of whether durational requirements imposed upon voters were subject to a strict scrutiny or intermediate scrutiny analysis. Citing to *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) it found "that a restriction on the right to run for public office does not compel a strict scrutiny analysis." *Id.* at 697. In doing so, the Court stated that "[s]ince the Supreme Court's decision in *Bullock,* there has been general consensus that strict scrutiny should not apply to requirements that candidates live in a district or municipality for a particular duration. With the development of the intermediate scrutiny analysis, that

level appears to have become the more commonly applied level of scrutiny." *Id.* at 698.

The Opinion then applied the intermediate scrutiny analysis to the case before it and found that the one-year residency requirement was reasonably and suitably tailored to further the legitimate governmental objectives previously noted.[1] The Opinion held that *Robertson* erred in its conclusion that the long-standing one-year residency requirement was unconstitutional and in a pithy peroration stated: "The decision not only applied an inappropriate standard in its analysis, it also employed flawed facts and failed to appreciate the validity of the state interests that the centuries-old requirement promotes." *Id.* at 702.

## II. DISCUSSION

Acting on the New Jersey Supreme Court's suggestion, the New Jersey Attorney General (the "State") now moves in this case, pursuant to Fed.R.Civ.P. 60, for an order vacating this Court's injunctive Order of November 13, 2002. In doing so, the State argues that (1) the New Jersey Supreme Court's February 16, 2012 ruling merits relief from this Court's prior injunction; (2) the New Jersey Constitution's one-year Legislative District residency requirement does not violate the federal Equal Protection Clause; and (3) the residency requirement furthers New Jersey's legitimate interest of mutual familiarity between state legislators and their district constituents.

Six organizations have moved for an order permitting them to intervene as Plaintiffs in this action as of right, pursuant to Fed.R.Civ.P. 24(a). They are the New Jersey Democratic State Committee, Com-

munications Workers of America, AFL–CIO, Latino Action Network, Latino Coalition of Monmouth County, Latinas United For Political Empowerment, Political Action Committee, and Women's Political Caucus of New Jersey (the "Interveners").

The Interveners claim to have an interest in the matter that is the subject of this action because they represent residents and candidates in the election districts that would be prohibited from running for the State Assembly and Senate, should the November 13, 2002 Order be vacated, and disposition of this matter might impair their ability to protect that interest. The Interveners further assert that it is unlikely that the existing Plaintiffs will adequately represent the Interveners' interests because the Order sought to be vacated is more than ten years old and Plaintiffs no longer have any interest in this matter.

### A. Standard of Review

Federal Rule of Civil Procedure 60 provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" for several enumerated reasons or for "any other reason that justifies relief." Rule 60 further requires that any motion thereunder be made within a "reasonable time." Fed.R.Civ.P. 60(c). The parties do not dispute the State's ability to move for relief before this Court under the present posture of this case.

### B. Motion for Intervention

Federal Rule of Civil Procedure 24(a) provides for intervention as of right, where a party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that dis-

---

1. The Court further held that its ruling was not a "new" ruling that is limited to prospec- tive application

posing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

██ The Interveners persuasively argue that they meet the requirements of Rule 24(a) because they "have a direct and current interest in representing the interests of not just the original named Plaintiffs, but a large number of New Jersey voters, candidates, and potential candidates impacted by the injunction." (Interveners' Br., 10.) Indeed, the residency requirement affects more than one third of New Jersey's towns and localities during a reapportionment year, and many of the Interveners appeared as *amici curiae* in the New Jersey Supreme Court case that led to the ruling suggesting that this Court revisit its November 13, 2002 injunctive order. Moreover, it is unlikely that the original Plaintiffs in the *Robertson* case will represent the interests of the Interveners because those Plaintiffs do not currently hold legislative positions that could be challenged.[2] This is further evidenced by the fact that the *Robertson* Plaintiffs have not filed any opposition to the Motion to Vacate. Consequently, the Interveners' Motion to Intervene is granted.

## C. Motion to Vacate

### i. *Authority of the New Jersey Supreme Court Opinion*

██ Before reassessing the merits of this prior ruling that the New Jersey State Constitution's one-year residency requirement to run for the General Assembly and State Senate violates the Equal Protection Clause, it is first important to consider whether the New Jersey Supreme Court had the authority to rule on this matter in the first place in the face of this Court's ten-year-old order enjoining the New Jersey Attorney General and Secretary of State from enforcing the one-year durational residency requirement.

██ "No state legislator or executive or judicial officer can .... annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments." *Cooper v. Aaron*, 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (quotation omitted). In furtherance of this axiom, "the United States Supreme Court has issued clear instructions when collateral attacks on final federal court judgments are attempted by state court systems:

> Congress ... has in no way relaxed the old and well-established judicially declared rule that state courts are completely without power to restrain federal-court proceedings in *in personam* actions like the one here. And it does not matter that the prohibition here was addressed to the parties rather than to the federal court itself.

*Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 755 F.2d 38, 42–43 (3d Cir.1985) (quoting *Donovan v. City of Dallas*, 377 U.S. 408, 413, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964)). Such collateral attacks "fl[y] in the face of settled law and the doctrine of *res judicata*." *Id.* at 42. Indeed, "where the judgment or decree of the Federal court determines a right under [federal law] ..., that decision is 'final until reversed in an appellate court, or modified or set aside in the court of its rendition.'"[3] *Stoll v. Gottlieb*, 305

---

**2.** Furthermore, those Plaintiffs who continue to seek office will have now met the one-year residency requirement.

**3.** According to the Court of Appeals, this principle arises out of the Full Faith and Credit Clause of Article IV § 1 of the United States Constitution, under which there "is a clearly

U.S. 165, 170, 59 S.Ct. 134, 83 L.Ed. 104 (1938) (quoting *Deposit Bank of Frankfort v. Board of Councilmen of City of Frankfort*, 191 U.S. 499, 520, 24 S.Ct. 154, 48 L.Ed. 276 (1903)); *see also Delaware Valley*, 755 F.2d at 45 ("State courts are destitute of all power to interfere with the proceedings or decisions of the national courts." (J. Stern, Concurring) (quotation omitted)).

At the outset of its Opinion, the New Jersey Supreme Court announced its ability to rule independently on the issue of whether the one-year durational residency requirement in the New Jersey Constitution violates the Equal Protection Clause of the United States Constitution in the face of a federal lower court ruling on that issue. However, it failed to fully consider the effect of this Court's ten-year-old decree enjoining the New Jersey State Attorney General and Secretary of State from enforcing the durational residency requirement.

While the Court noted that it was unable to vacate the injunction, it nonetheless found that it could independently uphold the durational residency requirement and enjoin Mosquera from taking office. In doing so, it noted that this Court's decree "enjoins only the Attorney General and the Secretary of State, and their agents, leaving every other person—including candidates, voters, and the Courts of this State—entirely free to disregard it and to continue to expect that a longstanding pro-

vision of our Constitution will be honored." *In re Contest*, 40 A.3d at 712.

This position is untenable because it, in effect, nullifies this Court's prior injunction. Allowing for a collateral attack against the injunction from anyone except the original parties to it [4] would mean that individuals could not reasonably rely on law that had been settled for ten years in determining whether or not they are eligible to run for New Jersey State Senate or General Assembly. In other words, despite this Court's ruling that the durational residency requirement is unconstitutional, its injunction against enforcing that requirement, and the New Jersey Attorney General's compliance with the injunction and refusal to appeal it over the course of ten years, individuals who win seats in the New Jersey State Assembly or Senate risk having their victories challenged in state court on the basis of the durational residency requirement.[5]

Consequently, while the New Jersey Supreme Court's Opinion is a scholarly discussion of this Court's prior ruling and of the general subject of residency requirements, it amounts to an improper collateral attack on that ruling and therefore cannot serve as a basis on which to vacate it.

### ii. Merits of the Robertson Ruling

#### a. Standard of Review

■ In assessing whether this Court came to the correct result in *Robertson*, it

---

established rule that state courts must give full faith and credit to the proceedings of federal courts[.]" *Delaware Valley*, 755 F.2d at 43 (quotation omitted).

4. As a practical matter, the New Jersey Supreme Court allowed the New Jersey Attorney General, who was a party to the prior injunction, to enforce the durational residency requirement by arguing in favor of upholding and in favor of enjoining Mosquera from taking office on the basis of it.

5. As a further practical matter, because the New Jersey Supreme Court recognized this Court's ruling and injunction but nonetheless decided to uphold and enforce the durational residency requirement, the New Jersey Attorney General is now subject to competing judicial decrees that now affect proceedings in this Court.

is first important to determine whether it applied the correct standard of review to the one-year durational residency requirement contained in Article IV, § 1, ¶ 2 of the New Jersey Constitution. As previously discussed, the Court applied strict scrutiny to the residency requirement. In doing so, it noted that the requirement burdened "the combined [fundamental] right of persons to run for public office and the right of voters to vote for candidates of their choice." *Robertson,* 150 F.Supp.2d at 696. The Court further explained that "the Supreme Court has held that restrictions on the right of persons to run for office can have an adverse impact on voters' right to vote, substantially limiting their choice of candidates. In those circumstances the state has impaired a fundamental right, and its action must be subject to strict scrutiny." *Id.* at 694 (citing *Bullock v. Carter,* 405 U.S. 134, 144, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)).

The State now argues that the Court should reevaluate this finding and apply the rational basis test to the one-year residency requirement. In doing so, it relies heavily on this Court's recent ruling in *Lewis v. Guadagno,* 837 F.Supp.2d 404 (D.N.J.2011), *aff'd* 445 Fed.Appx. 599 (3d Cir.2011). *Lewis* addressed, among other things, a facial challenge to durational residency requirement of an entirely different nature in the New Jersey Constitution "requir[ing] that any and all persons aspiring for the office of state senator in the State of New Jersey must have been a citizen and resident in the State for at least four years before the election." 837 F.Supp.2d at 412 (citing N.J. Const. Art. 4, § 1, ¶ 2).

The *Lewis* Court found that the durational requirement merited rational basis review because it "governs all individuals fairly and equally, without regard to or reliance on any suspect classification." *Id.* The Court further explained:

[T]he durational residency requirement does not shrink the pool of candidates so profoundly, and on such arbitrary or impermissible grounds ... as to undermine fundamental rights and privileges, including the rights of voters.

On the contrary, a durational residency requirement for aspirants of state political office has nothing more than a minor, incidental impact on the rights of citizens to vote. That fact alone does not warrant strict scrutiny. After all, citizens do not have an unfettered right to select *any* person of their choosing for public office.

*Id.* at 412–13 (emphasis in original).

The State also makes much of the notion that "there is no fundamental right of candidacy," that "states may impose a durational residency requirement for candidates for state offices," and that "creat[ing] barriers ... tending to limit the field of candidates from which voters might choose ... does not itself compel strict scrutiny." (Attorney General's Br. 10, 11, 12) (quotations and citations omitted).

The Court does not dispute this. However, as the Supreme Court explains, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). Consequently, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Id.*

Indeed, "[i]n assessing challenges to state election laws that restrict access to the ballot, [the Supreme Court] has not

formulated a litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause." *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (quotation omitted). "Decision in this area of constitutional adjudication is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions." *Id.* (citations omitted). Accordingly, "[t]he inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity." *Id.* at 964, 102 S.Ct. 2836 (quotation omitted).

Here, in contrast to the requirement addressed in *Lewis* that a candidate for state senate have resided in New Jersey for four years, which presented a minimal burden to candidates and voters and therefore merited rational basis review, the requirement that a candidate have resided for one year in the legislative district that he or she seeks to represent substantially limits the candidate pool during reapportionment years, and, in turn, the fundamental right to vote for the candidate of one's choice.[6] *See Clingman v. Beaver*, 544 U.S. 581, 610, 125 S.Ct. 2029,

161 L.Ed.2d 920 (2005) ("[T]he right to vote . . . is the right to vote 'for the candidate of one's choice.'") (quoting *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). Indeed, it is undisputed that reapportionment displaces approximately one-third of New Jersey's residents from their previous legislative districts.[7] Furthermore, because the reapportionment process occurs approximately seven months prior to the election, candidates who are displaced from their pre-apportionment electorate do not even have the opportunity to satisfy the one-year residency requirement for that electorate's district.[8] Thus, the one-year durational residency requirement must be subject to heightened scrutiny. However, the Court need not decide whether to apply intermediate or strict scrutiny, because, as discussed below, the durational requirement survives neither.

b. *Application of Heightened Scrutiny to the Durational Residency Requirement*

 Strict scrutiny requires that a law or policy "is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Entertainment Merchants Ass'n,* — U.S. ——, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011) (citation omitted). Intermediate

6. To be sure, the one-year residency requirement does not burden the right to vote during non-reapportionment years and should therefore be upheld as applied during those years. As discussed further below, the scope of the Court's prior injunctive order will be modified to reflect this application.

7. On reply, the State argues that this evidence does not necessarily suggest that the candidate pool has been substantially limited because, in the six general elections since the 2001 reapportionment plan, there has only been one challenge to an election based on a candidate's district residency. As the State is well-aware, however, it was enjoined by this

Court from enforcing that requirement during that time, which may explain the dearth of challenges on the basis of it.

8. As discussed further below, this is particularly problematic when reapportionment separates incumbents from their constituents, either by placing the incumbent or a substantial portion of her constituents into a different district. Because the incumbents don't have the opportunity to take up residence in their constituents' district in time to run in the upcoming election, their constituents cannot even vote for those who had represented them in prior years.

scrutiny demands that a law or policy "directly advanc[e] a substantial governmental interest and be n[o] more extensive than is necessary to serve that interest." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 130 S.Ct. 1324, 1339, 176 L.Ed.2d 79 (2010) (quotation omitted). The durational residency requirement that candidates for New Jersey State Senate and General Assembly have resided for one year in the legislative district that they seek to represent withstands neither strict nor intermediate scrutiny as applied during reapportionment years.

The State contends that the durational residency requirement serves three interests: "1) ensuring the electorate's familiarity with the candidate; 2) ensuring the candidate's familiarity and knowledge of the prospective constituency and its concerns and issues; and 3) preventing political carpetbagging." (Attorney General's Br. 16.) During reapportionment years, the durational residency requirement serves none of these interests.

As previously discussed, reapportionment occurs approximately seven months before the election. Consequently, during reapportionment years, the one-year residency requirement cannot possibly serve to ensure either the prospective constituency's familiarity with a candidate, the candidate's familiarity with the constituency, or prevent carpetbagging, when the constituency has only existed for seven months.

Moreover, as the Court recognized in its prior opinion, in many instances, district lines can be highly artificial, because they "run down the middle of streets and through the heart of local neighborhoods."

*Robertson*, 150 F.Supp.2d at 697. Thus, the durational residency requirement, as applied during reapportionment years, may even perversely result in carpetbagging. Consider a situation where a substantial portion of an incumbent's constituents are reapportioned into a different district. She cannot follow her constituents to their new district to represent them because she will not satisfy the one-year residency requirement in time for the upcoming election. As a result, they may very well be represented by someone less familiar in their new district. At the same time, if she runs for office in her current district, she would represent a constituency with which she is unfamiliar. And the same holds true for an incumbent whose residence is placed in a different legislative district from that of her constituents.[9]

These are not far-fetched hypotheticals. Indeed, the Interveners provide several examples of this perverse result in their opposition to the State's motion to vacate. One such example concerns Asm. Reid Gusciora, who has represented the 15th District in the General Assembly since 1996. During the 2011 reapportionment, his hometown of Princeton Borough was moved from the 15th District to the 16th District. However, every other town that he represented—amounting to 86% of his constituency—remained in the 15th District. Consequently, Asm. Gusciora moved to Trenton to continue to represent his constituents in the 15th District in subsequent elections. Had he chosen to remain in his hometown and run in the 16th District, he would have remained relatively unfamiliar with the electorate and could arguably be accused of carpetbagging.

9. In fact, in a case where an incumbent is placed in a new legislative district, the incumbent could foreseeably be prevented from running in any district during the reapportionment year because she will not have met the one-year residency requirement in either her old or new district.

These issues need not only arise with respect to incumbents. Indeed, one can easily imagine a situation during a reapportionment year where a resident of a particular district, over time, becomes familiar with the district and its electorate and wants to run in the upcoming election, but whose residence is reapportioned out of the district (or whose electorate is reapportioned out of the district). That resident faces the same choice of either following the electorate to a different district where she will be ineligible to run in the upcoming election, or run in a district with which she remains unfamiliar.

Despite these perverse outcomes, the State contends that the Court should follow the reasoning of the aforementioned cases of *Sununu* and *Chimento*—which were mentioned and distinguished in the *Robertson* opinion—and uphold the durational residency requirement, even under a strict scrutiny analysis, because the provision (1) relates to principal state-wide offices and (2) dates back to the original New Jersey Constitution and is therefore entitled to extra weight. Both contentions are unpersuasive.

The State notes that "the office of State Senator is one of high rank, one not limited to the particular district from which he or she is elected, but of great import to all of the people of the State. Senators are charged with acting on all of the great issues of State and play a key role in filling statewide offices in both the Executive and Judicial Branches of government." (Attorney General's Br. 21.) The State further notes that the New Jersey General Assembly has certain powers that affect the state as a whole, including "the sole authority to originate revenue bills" and "sole impeachment powers of a state officer." (*Id.*)

The Court does not dispute that both the New Jersey State Senate and General Assembly carry out duties that affect the state as a whole. That is why Article IV, § 1, ¶ 2 of the New Jersey Constitution sensibly requires that Senators have resided in New Jersey for four years and that Assemblypersons have resided in the state for two years.[10] In contrast, the requirement that a Senator or Assemblyperson have resided for one year in the legislative district that they seek to represent unquestionably relates to their district-level responsibilities. Indeed, as the State previously argued, the very basis of that requirement is to ensure that a given district electorate is sufficiently familiar with its representative, and vice versa.

With respect to its contention that the one-year durational residency requirement dates back to 1776, the State points to the fact that the first New Jersey Constitution, signed on July 2, 1776, contains a provision stating that "each county shall also choose three members of assembly; provided, that no person shall be entitled to a seat in said assembly, unless he be and have been, for one whole year next before the election, an inhabitant of the county he is to represent." N.J. Const. of 1776 art. III. The State further notes that this provision remained in the New Jersey Constitution up until 1966, when it was amended to substitute the word "district" for the word "county".

While the notion of a residency requirement in a political subdivision of New Jersey undoubtedly dates back to 1776, the concept that the geographical area of a political subdivision could change during a reapportionment year dates back to 1966, when the New Jersey Constitution was amended in order to comply with the Supreme Court's one-person one-vote re-

**10.** Indeed, the durational residency requirements upheld in *Sununu* and *Chimento* concerned state residency, not legislative district residency.

quirement set forth in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Indeed, before 1966, members of the New Jersey State Senate and General Assembly represented whole counties, whose boundaries were never altered. Therefore, not until 1966 did anyone in the state contemplate that a legislator or candidate could be moved arbitrarily from one political subdivision to another as a result of reapportionment.[11]

In sum, because the one-year durational residency requirement contained in Article IV, § 1, ¶ 2 of the New Jersey Constitution remains in violation of the Equal Protection Clause, the State's motion to vacate the Court's prior injunction is denied.

### D. Scope of the Injunction

In addition to seeking to uphold the Court's prior injunctive order, the Interveners also ask the Court to modify its scope. Specifically, they ask the Court to enjoin enforcement of the one-year durational residency requirement contained in Article IV, § 1, ¶ 2 of the New Jersey Constitution only during reapportionment years because "the serious infringement on voter and candidate choice that occur through application of the residency requirement directly after reapportionment [do not] apply equally in other years." (Intervenor's Br. 30.) This suggestion is well-taken because the aforementioned issues of candidates and incumbents becoming arbitrarily separated from their constituents do not arise in years where there is no reapportioning of legislative districts.

■ The State argues that the Court should decline to consider this suggestion because it would be more appropriately brought before a New Jersey state court. To support this argument, the State invokes the abstention doctrines set forth by the Supreme Court in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) and *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

■ In *Burford*, the Supreme Court encouraged federal courts to "decline to exercise equity jurisdiction when the result is to permit a State court to have an opportunity to determine questions of State law which may prevent the necessity of decision on a constitutional question." 319 U.S. at 333 n. 29, 63 S.Ct. 1098. "The purpose of *Burford* abstention ... [is] to avoid federal intrusion into matters of local concern and which are within the special competence of local courts." *Chiropractic Am. v. Lavecchia*, 180 F.3d 99, 104 (3d Cir.1999) (quotation omitted).

■ Similarly, *Pullman* abstention is warranted "when a federal court is presented with both a federal constitutional issue and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question, ... [thus] avoid[ing] 'needless friction with state policies.'" *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Whitman*, 99 F.3d 101, 107 (3d Cir.1996) (quotation and citation omitted).[12]

This argument fails to recognize the current posture of this case. As previously

---

**11.** Reapportionment up to 1966 merely changed the number of representatives per county.

**12.** "*Pullman* abstention requires the following special circumstances: (1) uncertain issues of state law underlying the federal constitutional claim; (2) state law issues subject to state

court interpretation that could obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claim; and (3) an erroneous construction of state law by the federal court would disrupt important state policies." *Presbytery of New Jersey*, 99 F.3d at 107 (citations omitted).

discussed, the New Jersey Supreme Court's ruling on the constitutionality of the one-year durational residency requirement in the face of this Court's 2001 ruling enjoining its enforcement amounts to an improper collateral attack. Thus, to now ask the Court to abstain from considering the scope of its injunction is to ask it to encourage future improper collateral attacks against the injunction in New Jersey state courts. Moreover, it is well-settled that federal district courts may, at the behest of beneficiaries of a prior injunction, modify the scope of the injunction in order to achieve its purpose. *See Salazar v. Buono,* 559 U.S. 700, 130 S.Ct. 1803, 1831, 176 L.Ed.2d 634 (2010) ("When the beneficiary of an injunction seeks relief to achieve the purposes of the provisions of [a] decree … a district court has the authority to modify the decree so as to achieve the required result with all appropriate expedition." (quotation omitted)).

Consequently, the Interveners' request to modify the scope of the Court's November 13, 2002 Order to now enjoin the New Jersey Attorney General and Secretary of State from enforcing the one-year durational residency requirement in Article IV, § 1, ¶ 2 of the New Jersey Constitution, only during years where the state undergoes legislative reapportionment, is granted.

### III. CONCLUSION

For the foregoing reasons, the Interveners' Motion for Intervention is GRANTED. The State's Motion to Vacate the Court's November 13, 2002 Order enjoining the New Jersey Attorney General and Secretary of State from enforcing the one-year durational residency requirement in Article IV, § 1, ¶ 2 of the New Jersey Constitution is DENIED. The Interveners' request to modify the scope of that Order to now enjoin the New Jersey At-

torney General and Secretary of State from enforcing the one-year durational residency requirement in Article IV, § 1, ¶ 2 of the New Jersey Constitution, only during years where the state undergoes legislative reapportionment, is GRANTED.

The Court will enter an order implementing this opinion.